[Civ. No. 21862. Third Dist. Jan. 25, 1985.]

WILLIAM C. LYNCH, as Assessor, etc., Plaintiff and Appellant, v.
STATE BOARD OF EQUALIZATION, Defendant and Respondent;
CALIFORNIA INDEPENDENT PRODUCERS ASSOCIATION et al.,
Interveners and Appellants;*†
ALEXANDER POPE, as Assessor, etc., et al.,
Interveners and Respondents.‡

CALIFORNIA INDEPENDENT PRODUCERS ASSOCIATION et al.,
Plaintiffs, Cross-defendants and Appellants,* v.
HERBERT E. ROBERTS, as Assessor, etc.,
Defendant, Cross-complainant and Appellant;
COUNTY OF KERN, Defendant, Cross-complainant and Respondent.

*Throughout the proceedings California Independent Producers Association has proceeded jointly with McFarland Energy, Inc., Seaboard Oil & Gas Co.; Santa Fe Energy Company; W. K. Barker & Associates; Daniel J. Pickerell; Callon Petroleum Company; M. H. Whittier Corporation; and Drilling & Production Co., Inc.

†Throughout the proceedings Western Oil & Gas Association has proceeded jointly with Atlantic Oil Company; Exxon Corporation; Kernridge Oil Company; Mobil Oil Corporation; Shell Oil Company; and Union Oil Company of California.

‡Throughout the proceedings Richardson has proceeded jointly with Earl D. Cornwell as Superintendent of the Schools of the County of San Luis Obispo; Kern High School District; Taft Union High School District; Elk Hills School District; Belridge School District; Midway School District; and McKittrick School District.

**COUNSEL**

L. B. Elam, County Counsel, and Monte Fuller, Deputy County Counsel, for Plaintiff and Appellant.

Parker, Milliken, Clark & O'Hara, Richard L. Franck, Leslie W. Mullins, McCutchen, Doyle, Brown & Enersen, John R. Reese, Gayl A. Westendorf, Kenta K. Duffey, Hanna & Morton, Edward S. Renwick, Cynthia L. Burch, Greg Ryan, Charles O. Lamoree, County Counsel,

Thomas H. Gordinier, Chief Deputy County Counsel, Milton Goldinger and Billy B. Burton for Interveners and Appellants and Plaintiffs, Cross-defendants and Appellants.

Rudnick, Arrache & Clark, Juan E. Arrache, Jr., and Valiant R. Stull for Defendant, Cross-complainant and Appellant and Intervener and Appellant.

James J. Delaney for Defendant and Respondent.

Hill, Farrer & Burrill, Vincent C. Page, Jack R. White, John H. Larson, County Counsel, Lawrence B. Launer, Deputy County Counsel, Ralph B. Jordan, County Counsel, Bernard C. Barmann, Chief Deputy County Counsel, Frank J. Fekete, Peter C. Carton, Joanne A. Welman, Roger Wilner, Stephen L. Hartsell, Ralph R. Kuchler, County Counsel, and Diane C. Popowski, Deputy County Counsel, for Interveners and Respondents.

Dorothy L. Schechter, County Counsel, and Anthony Strauss, Assistant County Counsel, for Intervener and Appellant and Defendant, Cross-complainant and Respondent.

## OPINION

**SPARKS, J.**—This coordinated proceeding concerns the meaning and validity of article XIII A of the California Constitution, adopted by the electorate as Proposition 13 at the June 1978 primary election, as it applies to the assessment of oil and gas properties. Although there are numerous parties to this proceeding, they fall into three main groups. First, the oil and gas interests insist that article XIII A is fully applicable to oil and gas properties, and that such properties have been consistently overvalued since the adoption of article XIII A. Second, a number of county government interests assert that article XIII A does not apply to oil and gas properties, and that these properties have been consistently undervalued since the adoption of article XIII A. Third, the California State Board of Equalization (Board) and other respondents contend that the Board's rule (Cal. Admin. Code, tit. 18, § 468), which might be termed an intermediate position, is the proper interpretation of article XIII A as it applies to oil and gas properties. The trial court upheld the Board's rule and the parties asserting each of the other positions appeal. We agree with the trial court and therefore shall affirm the judgment.

### FACTS

If precedent teaches anything it is that oil and gas interests are truly *sui generis*. (See generally Colby, *The Law of Oil and Gas* (1943) 31

Cal.L.Rev. 357.) These interests first became economically significant at a time when our basic notions of property had already crystallized. (*Callahan* v. *Martin* (1935) 3 Cal.2d 110, 115 [43 P.2d 788, 101 A.L.R. 871].) At that time the ultimate world importance of petroleum could not have been remotely anticipated. (Colby, *op. cit. supra,* at p. 373, fn. 47.) The courts attempted to fashion rules of law by analogies drawn from other fields of law which were often inapt for comparison. (*Railroad Commission* v. *Oil Co.* (1940) 310 U.S. 573, 579 [84 L.Ed. 1368, 1372, 60 S.Ct. 1021]; see also Glassmire, Oil and Gas Leases and Royalties (2d ed. 1938) § 1, pp. 1-2.) But oil and gas interests are by their very nature unique, and the attempt to classify them in legal terms presents "as thorny a problem as has challenged the ingenuity and wisdom of legislatures [and courts]." (*Railroad Commission* v. *Oil Co., supra,* 310 U.S. at p. 579 [84 L.Ed. at p. 1372].) As a consequence those who dealt in oil and gas interests had difficulty in describing the interests transferred and ambiguous and uncertain instruments were presented to courts for analysis. (*Dabney-Johnston Oil Corp.* v. *Walden* (1935) 4 Cal.2d 637, 651 [52 P.2d 237].) With respect to these interests the California Supreme Court has lamented: "Their nature is far from certain or definite. They are obscure to say the least." (*Delaney* v. *Lowery* (1944) 25 Cal.2d 561, 569 [154 P.2d 674].) Thus, "the nature of the interests which may exist in oil and gas, is complex, partly because of the inexactness of the terminology which is available to describe them." (1 Williams & Meyers, Oil and Gas Law (1983) § 201, p. 17.)

In order to understand the nature of the property interests in oil and gas producing properties it will be necessary to describe briefly the physical occurrence of oil and gas. Although the witnesses at trial and the commentators agree that no two deposits of oil and gas are exactly alike, there is no dispute as to the general physical characteristics of an oil and gas producing property. Oil and gas deposits generally occur in sedimentary beds of sandstone, shale and limestone. (See Colby, *op. cit. supra,* 31 Cal.L.Rev. at p. 358.) The oil and gas exist in the interstices of the rock occupying certain strata, referred to as "oil sands." (*Ibid.*) Within a reservoir fluids are trapped under pressure, the amount of which is dependent largely upon the depth of the deposit. (*Ibid.*) This pressure is referred to as "reservoir energy" and may be utilized in the initial extraction process. (*Ibid.*)

Oil and gas deposits, due to their fluid nature, are capable of migration through the rock interstices in which they exist. (Colby, *op. cit. supra,* at p. 360.) In the course of time oil and gas deposits have become trapped in the most favorable location and there is little if any migration in the absence of a disturbance of the deposit's equilibrium. (*Ibid.*) However, when this equilibrium is disturbed, such as by penetration by a well bore, the pressure

differential can cause the oil and gas to migrate. This aspect of the nature of oil and gas has caused them to be referred to as "fugacious minerals" (see Glassmire, *op. cit. supra,* § 1, p. 1), which implies that they are not fixed in a certain place, but are wandering. (See Webster's Third New Internat. Dict. (1971) p. 918, "fugacious," def. 2.)

Recoverable gas deposits often exist where there is no recoverable oil. The wells which produce gas only are referred to as "dry gas wells." Most oil wells also produce some associated gas. In such a deposit the force of gravity has generally caused the gas and oil to separate with the lighter gas existing in the upper strata and the heavier oil existing in the lower strata of the formation. There is generally some water associated with the deposit which, because of its heavier nature, exists below the oil bearing strata. The total oil and gas within a deposit is referred to as the oil in place or the gas in place. Although it is generally accepted that *all of the oil and gas ever created* and not yet recovered is in place, no one knows or can accurately estimate the extent of such deposits.

There are three separate phases in the life of an oil and gas producing property. These are discovery, development, and production. Discovery is a function of geological effort wherein geophysicists and geologists determine the optimum place to drill a new well. When oil and gas is discovered very little is known about the amount of oil and gas in place and the potential recovery. During the development process wells are drilled and petroleum engineers and technical staff constantly evaluate the field in order to make knowledgeable decisions regarding how the field can best be produced. The primary development phase ends when the total field has been delineated.

The production phase of an oil and gas producing property may be subdivided into a primary phase and a secondary (and even tertiary) phase in which augmented recovery programs are utilized. Primary recovery utilizes the natural reservoir energy (pressure) and pumping or lifting to extract the hydrocarbon substances. The proportion of the original oil in place which can be recovered through primary recovery methods varies with the particular property, but is typically very low. In *People* v. *Associated Oil Co.* (1930) 211 Cal. 93, at page 106 [294 P. 717], the Supreme Court took judicial notice that only 10 to 25 percent of the oil in place was ultimately recovered. Advancements in technology may have improved that ratio, but it was estimated at trial that as low as 8 percent of the oil in place may be recoverable from primary production methods in some fields. The primary production phase may last for an extended time (20 or more years) and typically the amount of oil and gas produced declines over time. The primary production phase comes to an end when, based upon existing econom-

ics and technology, it is more profitable to cease production or to commence an augmented recovery program.

Under existing technology there are numerous secondary methods for augmented recovery of oil and gas.[1] Primarily these methods operate by reducing the viscosity of the oil in place, or by increasing the pressure in the reservoir, or both. These methods include steam injection, gas injection, and water injection into the reservoir. Other methods either are available or may become available through new advances in technology.[2] The particular type of augmented recovery program which is to be utilized must be tailored to the oil and gas field being produced. These augmented recovery methods can greatly increase the percentage of the oil in place which is recoverable, but two facts must be noted: First, whether an augmented recovery method is employed depends upon a variety of factors, not the least of which is economics; in short, an oil producer will not employ an augmented recovery technique if the technique costs more than the price at which the oil to be recovered can be marketed. Second, even though these techniques can greatly increase the percentage of oil in place which is recoverable, no technique currently available results in total recovery, leaving significant portions of oil presently unrecoverable. Thus, while vast amounts of petroleum products may lie "awaiting the demands and ingenuity of man," (Glassmire, *op. cit. supra*, § 1, p. 5), whether and when such products will be recovered depends upon price and technology.

The primary means for exploitation of an oil and gas producing property is through an oil and gas lease. Under such leases the landowner conveys to the producing company the exclusive right to drill and produce the oil and gas which may be underlying the land. Such leases may be for a fixed term with an option for renewal, but typically provide for a fixed term with a provision for continuance for so long thereafter as the lessee is able to produce oil and/or gas in "paying quantities."[3] "Paying quantities" means at a profit, and when the lessee can no longer produce hydrocarbons at a profit the lease typically terminates and the rights revert back to the landowner. The parties stipulated that the vast majority of all oil and gas producing properties in California are operated under oil and gas leases. It was

---

[1]Most of these methods are employed in an oil field from which there is also an associated gas recovery. There are very few, if any, enhanced recovery methods available for dry gas fields.

[2]An example noted at trial is a project in Southern California in which diatomaceous earth which is impregnated with oil is actually mined and processed to remove the oil.

[3]Civil Code section 718f limits the duration of some oil and gas leases to 99 years. That section reads: "A lease of land for the purpose of effecting the production of minerals, oil, gas, or other hydrocarbon substances from other lands may be made for a period certain or determinable by any future event prescribed by the parties but no such lease shall be enforceable after 99 years from the commencement of the term thereof."

established that such rights rarely undergo a change of ownership, and when a change of ownership does occur it is usually a marginal property that is involved.

The precise nature of the interest conveyed under an oil and gas lease has troubled the courts throughout the history of such properties. It was early held that the landowner had absolute title to the oil and gas underlying his land and that he conveyed to the producer such absolute title, but that title was defeasible if the oil and gas should migrate to the land of another. (See Colby, *op. cit. supra,* 31 Cal.L.Rev. pp. 374-379.) There is language in early California decisions which would indicate that California adopted an "ownership in place" theory. (See *Isom* v. *Rex Crude Oil Co.* (1905) 147 Cal. 659, 661 [82 P. 317].) Eventually, however, California took the position that ownership of oil and gas was inchoate, and the doctrine of "potential possession" arose. (See *Western Oil etc. Co.* v. *Venago Oil Corp.* (1933) 218 Cal. 733, 739 [24 P.2d 971, 88 A.L.R. 1271]; *Brookshire Oil Co.* v. *Casmalia etc. Co.* (1909) 156 Cal. 211, 215 [103 P. 927].) This doctrine was ultimately rejected. (*Callahan* v. *Martin, supra,* 3 Cal.2d at p. 128.) Finally, the Supreme Court took the position in *Callahan* that the lessee under an oil and gas lease "has an interest or estate in real property in the nature of a profit *a prendre,* which is an incorporeal hereditament . . . ."[4] (*Id.,* at p. 118.) ▪ In essence, the courts now recognize that the owner of land does not have title to the oil and gas which may underlie his property; instead he has the exclusive right on his premises to drill for oil and gas and to retain as his property all substances brought to the surface. (See *Atlantic Oil Co.* v. *County of Los Angeles* (1968) 69 Cal.2d 585, 594 [72 Cal.Rptr. 886, 446 P.2d 1006].) When this interest is transferred to a lessee the lessee obtains a *profit á prendre.* (*Ibid.*)

While the courts have employed various terminologies to resolve issues presented with respect to oil and gas properties, they have never insisted that such terminology is either totally descriptive or totally definitive of the rights involved. We find in the decisions frequent expressions of frustration at the task of applying existing rules of law to these unique interests. (See *Graciosa Oil Co.* v. *Santa Barbara* (1909) 155 Cal. 140, 144-145 [99 P. 483], material differences between oil and gas lease and an ordinary lease; *Mohawk Oil Co.* v. *Hopkins* (1925) 196 Cal. 148, 152-153 [236 P. 133], same; *Callahan* v. *Martin, supra,* 3 Cal.2d at p. 115, difficult to define;

---

[4]Hereditament means any kind of property that can be inherited. The French phrase "*profit á prendre*" literally means profit to take. Thus, "[a]n incorporeal hereditament is a right stemming from a corporeal thing. . . . It may relate to land, in which case it constitutes 'a limited interest or estate in land . . . .' [¶] A *profit á prendre* is an incorporeal hereditament; it is a right to take something from the land of another." (*Gerhard* v. *Stephens* (1968) 68 Cal.2d 864, 878, fn. 7 [69 Cal.Rptr. 612, 442 P.2d 692]; citations omitted.)

*Delaney* v. *Lowery, supra,* 25 Cal.2d at p. 569, obscure.) It has been recognized that the definitions of the interests involved are subject to legislative and judicial refinement. (*People* v. *Associated Oil Co., supra,* 211 Cal. at p. 105. See also *Delaney* v. *Lowery, supra,* 25 Cal.2d at p. 569.) And a definition employed for one purpose is not necessarily controlling in respect to another purpose. (*Atlantic Oil Co.* v. *County of Los Angeles, supra,* 69 Cal.2d at pp. 594-595.)

 While the interests of a lessee under an oil and gas lease are difficult to define, it has long been recognized that they are interests in real property and are subject to real property taxation. In *Graciosa Oil Co.* v. *Santa Barbara, supra,* 155 Cal. at pages 144 to 146, it was contended that the assessment of land to the landowner included all interests, including the interest of an oil and gas lessee, and that the interest under the oil and gas lease could not be separately assessed. The Supreme Court rejected this contention and held that the mining rights and privileges of the lessee should be separately assessed to the lessee. (See also *Atlantic Oil Co.* v. *County of Los Angeles, supra,* 69 Cal.2d at p. 595.) And, unlike other taxable possessory interests in land, oil and gas interests are by statute placed on the secured rather than the unsecured property roll. (Rev. & Tax. Code, § 107;[5] see also *Board of Supervisors* v. *Lonergan* (1980) 27 Cal.3d 855, 860 [167 Cal.Rptr. 820, 616 P.2d 802].)

With the establishment of the rule that oil and gas interests are taxable real property interests, the next major difficulty was in the valuation of such interests for tax purposes. Valuation is especially difficult in oil and gas interests because, as we have seen, the interests are unique. As the United States Supreme Court said in the early case of *Twin-Lick Oil Co.* v. *Marbury* (1876) 91 U.S. 587, at pages 592 and 593 [23 L.Ed. 328, at page 331], oil and gas properties are "subject to the most rapid, frequent and violent fluctuations in the value of anything known as property . . . ." Even at that time "[p]roperty worth thousands to-day is worth nothing to-morrow; and that which would to-day sell for $1,000 as its fair value, may, by the natural changes of a week or the energy and courage of desperate enterprise, in the same time be made to yield that much every day." California courts also recognized the fluctuating value of oil and gas interests. In *Acme Oil and Mining Co.* v. *Williams* (1903) 140 Cal. 681, at pages 684 and 685 [74 P. 296], the court said: "These leases are only valuable on development, and

---

[5]Revenue and Taxation Code section 107 provides in relevant part: "Leasehold estates for the production of gas, petroleum and other hydrocarbons substances from beneath the surface of the earth, and other rights relating to such substances which constitute incorporeal hereditaments or profits a prendre, are sufficient security for the payment of taxes levied thereon. Such estates and rights shall not be classified as possessory interests, but shall be placed on the secured roll."

are then only valuable to both parties, to the extent that the product may be secured and disposed of . . . ." Moreover, "when the flow is penetrated, he who operates his well most diligently obtains the greatest benefit, and this advantage is increased in proportion as his neighbor similarly situated neglects his opportunity." In *Graciosa Oil Co.* v. *Santa Barbara, supra,* 155 Cal. at page 145, the court said: "It is well known that such leasehold estates or interests in oil strata, after the discovery of oil, often command large prices in the market, all out of proportion to the value of the interest of the landowner receiving only the royalty and enjoying the use only for other purposes." Yet, as the court recognized in *Mohawk Oil Co.* v. *Hopkins, supra,* 196 Cal. at page 152: "The failure to find the oil or other mineral content of the soil strata, or the failure of the well to hold up to its original outflow may render the lease and the structures used in the operation of the well or wells under its terms practically valueless . . . ."

Ultimately a modified capitalization-of-income method of valuation became the most commonly accepted valuation technique with regard to oil and gas properties. (See *Atlantic Oil Co.* v. *County of Los Angeles, supra,* 69 Cal.2d at p. 592.) This approach was adopted by the Assessment Standards Division of the Property Tax Department of the California State Board of Equalization when it published, in 1966, a manual (AH 566) entitled Valuation of Oil and Gas Producing Properties. The manual was the product of a committee appointed by the chairman of the Standards Committee of the State Association of County Assessors to study the matter with a view towards promoting uniformity in assessment practices. The committee worked with industry representatives to design the manual, and the manual was jointly approved by the committee and an industry committee.

The capitalization method of valuation utilizes the concept of "proved reserves," for which purpose the definition of the American Petroleum Institute was adopted. Under this definition, proved reserves "'are the volumes of crude oil and natural gas which geological and engineering information indicate, beyond a reasonable doubt, to be recoverable in the future from oil and gas reservoirs under existing economic and operating conditions. They represent strictly technical judgments and are not knowingly influenced by policies of conservatism or optimism. They are limited only by the definition of the term "proved." They do not include what are commonly referred to as "probable" or "possible" reserves.'" It is apparent that "proved reserves" are not synonomous with the oil in place. It must further be noted that proved reserves do not include amounts of oil known to be recoverable under existing technology. This is because the determination of proved reserves is based upon *existing* economic and operating conditions. Thus, unless current prices would justify an augmented recovery program, oil and gas recoverable with such methods are not considered to

be proved reserves.[6] Moreover, even if prices may justify an augmented recovery program, recoverable oil and gas will be included within proved reserves only when successful testing of a pilot project or the operation of an installed program in the reservoir provides support for the engineering analysis upon which the program was based.

Proved reserves are not all *immediately* recoverable. In fact, some primary production periods may extend over lengthy periods of time. Typically the annual production from a field declines over this time. The valuation of an oil and gas producing property is achieved by determining an expected schedule of future production. Future income is determined from this schedule through the application of existing price and cost ratios. This future income schedule is then capitalized to reduce it to present value, and the total present value of expected future income is considered the taxable value of the oil and gas interest.

Numerous factors may cause the modified capitalization-of-income method of valuation to produce an inaccurate value. It is based upon an estimate of the oil and gas in place and the percentage thereof which is recoverable under existing economic and operating conditions. Typically when these estimates are originally made the engineers and assessors have the least amount of information with which to make the estimates. As experience is gained through the operation of a particular field the estimate can become more and more accurate, but no one can ever know for certain how much oil will be recovered from a particular property until it is abandoned. Moreover, these estimates ignore possible and probable technological advances and economic changes. Accordingly, estimates of proved reserves are subject to correction for, among other things, discovery that the field is geographically larger than believed, the successful installation of improved recovery techniques, and revisions based upon the difference between estimated production and actual production for the previous years. Changes in price and technology may also increase the amount of oil and gas which is deemed recoverable, and may extend the expected productive life of an oil and gas field.

Prior to the adoption of article XIII A, tax assessors typically placed either a zero or a nominal value on oil and gas properties during the dis-

---

[6]In the absence of future development of alternative sources economic principles of supply and demand and the lessons of the immediate past would certainly indicate that the price of oil and gas will, in time, increase sufficiently that all oil and gas which is technologically recoverable will be economically recoverable. Nevertheless, the definition of proved reserves does not include such recoverable oil and gas reserves. This "most conservative estimate" of reserves was accepted in the interest of uniformity and to avoid speculation in the valuation of oil and gas properties.

covery and development stages of the field's life.[7] As we have noted, this is the period in which the least information is available for estimating the value of the interest and thus is the period in which the value of the interest is subject to the most speculation. A value was assigned to the interest for the first time when "paying quantity" production was achieved. Thereafter annual reassessments were made to reflect changes in proved reserves attributable to any of the varied factors which determine proved reserves, including depletion due to the prior year's production.

This system of valuation, which was acceptable to both assessors and the industry, provided benefits to both. It promoted uniformity and avoided speculation in assessment practices, and yet it did not irremediably bind assessors with a valuation which would ultimately prove unrealistically low. But the method of valuation was as dependent upon annual reassessment as it was upon the concept of proved reserves. This is illustrated by facts derived from the Conservation Committee of California Oil Producers 1979 Annual Review of California Oil and Gas Production. With respect to oil that report indicates that on January 1, 1941, estimated reserves in California were 3.2 billion barrels.[8] From January 1, 1941, through December 31, 1979, California production totaled approximately 12.9 billion barrels. On that date estimated reserves totaled 3.6 billion barrels. Thus, the January 1, 1941, estimate of proved reserves underestimated future production by over 13 billion barrels. This is not to say that the 1941 estimate of proved reserves was inaccurate; it merely illustrates that the proved reserve concept deliberately understates future production in favor of capture through reassessment when probable or possible production becomes proven beyond a reasonable doubt.

During the last 20 years the value of California oil and gas properties have been affected by a number of external influences unrelated to those which normally affect real property values. In the 1960's there was tremendous technological advancement. During this time most of the potential oil and gas producing properties were "snapped up" by the industry. Companies are rarely, if ever, willing to part with significant oil and gas producing properties, with the result that there is virtually no market for such property interests. This eliminates a comparable sales method of valuation from hav-

---

[7]Whether a zero or nominal value was given to the oil and gas interest appears to have been dependent upon the company's desires. Some companies desired a nominal value for their interest so that in the event the freehold estate were sold for nonpayment of taxes it could not be contended that the oil and gas interest was included in the sale since they would have clearly been separately assessed.

[8]A barrel is the standard United States measure for oil and is equal to 42 gallons. In international trade oil is measured in metric tons, and in Canada oil is measured by the cubic meter.

ing any relevance in assessing these unique property interests. Moreover, since the production of oil and gas is essentially an extraction process rather than a construction process, the cost of reproduction method of assessment is unavailing.

In addition to technological advances, the oil and gas industry has been affected by economic influences unrelated to general inflationary trends. Primarily these influences consisted of the cost of foreign oil and governmental regulations. In the early 1970's foreign oil was less costly than domestic oil and there were mandatory import controls to prevent the price of foreign oil from affecting domestic prices. This system of regulation became inoperative in 1973 when domestic oil production "peaked out." In that year federal price controls went into effect and the price of oil was regulated from then until 1981 when it became fully deregulated. During this period the world price of oil was affected by two international incidents. The first was the 1973 Arab oil embargo. This caused the world oil price to rise sharply. The second was the 1978 Iranian revolution, coincident with a Saudi Arabian production cutback. The world oil price nearly tripled in that year. United States oil prices increased more slowly during this time due to federal price controls. With the deregulation of oil prices, however, domestic oil prices have approached world oil prices.

The influences these events had on the price of oil may be illustrated. In the early 1970's the average price of domestic oil was $3 to $4 a barrel, and California oil was considerably less, under $3 a barrel. From 1973 to 1975 the average cost of imported oil rose from $4.65 to $11.38 per barrel. The world price was relatively stable from 1975 to 1978, but from 1978 to 1980 the price rose from $12.46 to $35.63 per barrel, and in March 1981 was approximately $38 per barrel. From 1973 to 1975, the average cost of domestic oil increased from $3.89 to $7.67 per barrel. That price rose to about $9 by 1978, and from 1978 to 1980 rose to $25.80 per barrel. In March 1981 the price was approximately $33.50. California oil followed similar trends. The price rose from $3.11 in 1973 to $6.03 per barrel in 1975. From 1978 to 1980 the price rose from $7.22 to $26.02 per barrel, and was approximately $33.50 in March, 1981.

These price increases in oil and gas affect the value of an oil and gas property in two ways. First, since valuation is based upon existing price and cost ratios, when prices increase at a faster rate than costs the value of existing proved reserves increases. Second, increasing prices increase the proved reserve. This also occurs in two ways. First, it will be profitable to operate a well for a longer period even though production has fallen off,

and thus the life of the property as an oil and gas producer is increased.[9] Second, many secondary and tertiary methods of production which were not economically feasible become feasible when the price increases. Until 1978 the annual reassessment of oil and gas properties reflected these changes.

In the June 1978 primary election the voters added article XIII A to the state Constitution by passing Proposition 13. This measure imposed important limitations upon the assessment and taxing powers of state and local governments. (See *Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization* (1978) 22 Cal.3d 208, 218 [149 Cal.Rptr. 239, 583 P.2d 1281].) Among these limitations is a maximum 1 percent tax rate upon the full cash value of real property, except where necessary to pay prior indebtedness approved by the voters. (Art. XIII A, § 1.)[10]

There are two aspects of article XIII A which are involved in this dispute. The first is the so-called "rollback" provision of section 2, subdivision (a). That subdivision provides, in relevant part: "The full cash value means the county assessor's valuation of real property as shown on the 1975-1976 tax bill under 'full cash value' or, thereafter, the appraised value of real property when purchased, newly constructed, or a change in ownership has occurred after the 1975 assessment. All real property not already assessed up to the 1975-1976 full cash value may be reassessed to reflect that valuation." The second restriction of article XIII A involved here is that of section 2, subdivision (b). It provides: "The full cash value base may reflect from year to year the inflationary rate not to exceed 2 percent for any given year or reduction as shown in the consumer price index or comparable data for the area under taxing jurisdiction, or may be reduced to reflect substantial damage, destruction or other factors causing a decline in value."

In *Amador Valley,* the Supreme Court noted that although article XIII A is imprecise and ambiguous in a number of particulars, it nevertheless was not so vague and uncertain in its essential terms as to render it void and inoperable. (22 Cal.3d at pp. 245-247.) For instance, the article was subject to legislative and administrative construction with regard to its implementation which could resolve the ambiguities in the measure. (*Ibid.*) The court made note of the implementing regulations of the State Board of Equalization (Cal. Admin. Code, tit. 18, §§ 460-471), but did not consider the validity of any particular regulation. Among these implementing regulations

---

[9]This factor was built into the federal price control system during the 1970's. A well which produced less than 10 barrels per day was considered a "stripper" and was not subject to price controls. Moreover, a producer could apply for discretionary relief from price controls for marginally producing properties.

[10]Article XIII A has been subsequently amended. The amendments do not affect the issues tendered here.

is rule 468 pertaining to the assessment of oil and gas interests, which the parties have stipulated was adopted in procedural compliance with the Administrative Procedures Act.

As we have just noted, the State Board of Equalization, following the passage of Proposition 13, adopted rule 468 to establish valuation principles for taxation of oil and gas reserves. (See *Roberts* v. *Gulf Oil Corp.* (1983) 147 Cal.App.3d 770, 799 [195 Cal.Rptr. 393].) Rule 468, which is set out in full in the margin,[11] retains a capitalization-of-income system of valuation

---

[11]Title 18, California Administrative Code, section 468 provides: "(a) The right to remove petroleum and natural gas from the earth is a taxable real property interest. Increases in recoverable amounts of minerals caused by changed physical or economic conditions constitute additions to such a property interest. Reduction in recoverable amounts of minerals caused by production or changes in the expectation of future production capabilities constitute a reduction in the interest. Whether or not physical changes to the system employed in recovering such minerals qualify as new construction shall be determined by reference to Section 463(a).

"(b) The market value of an oil and gas mineral property interest is determined by estimating the value of the volumes of proved reserves. Proved reserves are those reserves which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. Present and projected economic conditions shall be determined by reference to all economic factors considered by knowledgeable and informed persons engaged in the operation and buying or selling of such properties, e.g., capitalization rates, product prices and operation expenses.

"(c) The unique nature of oil and gas property interests requires the application of specialized appraisal techniques designed to satisfy the requirements of Article XIII, Section 1, and Article XIII A, Section 2, of the California Constitution. To this end, the valuation of such properties and other real property associated therewith shall be pursuant to the following principles and procedures:

"(1) A base year value (market value) of the property shall be estimated as of lien date 1975 in accordance with Section 460.1 or as of the date a change in ownership occurs subsequent to lien date 1975. Newly constructed improvements and additions in reserves shall be valued as of the lien date of the year for which the roll is being prepared. Improvements removed from the site shall be deducted from taxable value. Base year values shall be determined using factual market data such as prices and expenses ordinarily considered by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and other mineral-producing properties and the production therefrom. Once determined, a base year value may be increased no more than two percent per year.

"(2) Base year reserve values must be adjusted annually for the value of depleted reserves caused by production or changes in the expectation of future production.

"(3) Additions to reserves established in a given year by discovery, construction of improvements, or changes in economic conditions shall be quantified and appraised at market value.

"(4) The current year's lien date taxable value of mineral reserves shall be calculated as follows:

"(A) The total unit market value and the volume of reserves using current market data shall be estimated.

"(B) The current value of taxable reserves is determined by segregating the value of wells, casings, and parts thereof, land (other than mineral rights) and improvements from the property unit value by an allocation based on the value of such properties.

"(C) The volume of new reserves shall be determined by subtracting the prior year's reserves, less depletions, from the estimated current total reserves.

"(D) The value of removed reserves shall be calculated by multiplying the volume of the

based upon proved reserves. However, it modifies the prior practice in important aspects. Essentially the rule treats additions to proved reserves due to changed physical or economic conditions as additions to the real property interest. These reserves are valued as of the time they first become proved reserves, and are thereafter "frozen" in value, subject only to the two percent inflationary increase permitted by article XIII A. In practice, at each annual reassessment the value of the oil and gas interest is reduced by depletions from the prior year's production, adjusted for the 2 percent inflationary increase, and increased by the current value of new proved reserves. The additions to the proved reserves are thereafter "frozen" in value pursuant to article XIII A.

This coordinated proceeding is the result of lawsuits filed in different counties. On June 30, 1980, William C. Lynch, the Assessor for the County of Sacramento, commenced a Sacramento County action against the State Board of Equalization. On August 8, 1980, in the Superior Court of Kern County, California Independent Oil Producers (CIPA) a nonprofit mutual benefit association, and a number of independent oil producers, commenced an action against Herbert E. Roberts, the Assessor of Kern County; the County of Kern; and the State Board of Equalization. It is unnecessary to set forth the numerous cross-complaints and complaints in intervention which were filed in each action. Eventually the actions were coordinated pursuant to California Rules of Court, rule 1501 et seq. After trial the coordination trial judge entered a judgment holding that rule 468 is constitutional, valid, and enforceable in all respects and for all years to which it applies. Numerous parties filed notices of appeal.

Although there are differences in the theories presented, the parties to this appeal fall into three general categories. The oil and gas interests consist of

reserves removed in the prior year by the weighted average value, for reserves only, per unit of minerals for all prior base years. The prior year's taxable value of the reserves remaining from prior years shall be found by subtracting the value of removed reserves from the prior year's taxable value.

"(E) The new reserves are valued by multiplying the new volume by the current market value per unit of the total reserves.

"(F) The current taxable value for reserves only is the sum of the value of the prior year's reserves, net of depletions as calculated in (D) above, factored by the appropriate percentage change in the Consumer Price Index (CPI) added to the value of the new reserves, as calculated in (E) above.

"(5) Valuation of land (other than mineral reserves) and improvements.

"(A) A base year value (market value) of land (including wells, casings and parts thereof) and improvements shall be estimated as of lien date 1975 in accordance with Section 460.1, the date of new construction after 1975, or the date a change of ownership occurs subsequent to lien date 1975.

"(B) The value of land (wells, casings and parts thereof) and improvements shall remain at their factored base year value except as provided in (6) below.

"(6) Value declines shall be recognized when the market value of the appraisal unit, i.e., land, improvements and reserves, is less than the current taxable value base of the same unit."

CIPA and the independent oil producers it represents; the Western Oil and Gas Association (WOGA) and the major oil and gas companies it represents; and Amerada Hess Corporation. These parties contend that rule 468 violates article XIII A of the Constitution in that it permits an increase in taxable value of an oil and gas property based upon changed economic circumstances in excess of the 2 percent per year limitation. They point out that since California has rejected the ownership-in-place theory of oil and gas rights, what is being taxed is the right to drill for and produce oil and gas, and they argue that additions to the proved reserve should not be allowed to increase the taxable value of the right. According to this argument, county assessors must consider the taxable value of an oil and gas interest to be the 1975 assessment with a 2 percent adjustment, regardless of how valuable the interest may actually become. It was shown at trial that if this position is accepted and the producers are allowed depletion for production, then by 1985 the entire 1975 proved reserve will be consumed and there will be no tax on oil and gas interests in the absence of a change of ownership, which we have seen seldom, if ever, occurs. The oil and gas interests counter this point by conceding that they should not be allowed depletion for production unless the actual value of the interest falls below the taxable value based upon the 1975 assessment.

A second group of appellants consists of the Assessors of Sacramento County (Lynch); Kern County (Roberts); and Ventura County (Waterman); and the Counties of Ventura and Solano. These parties contend that the voters did not intend article XIII A to apply to oil and gas interests, the production of oil and gas should be considered continuous construction or acquisition so that annual reassessment is proper, and that if article XIII A applies to oil and gas interests then depletion should not be allowed.

The respondents, of course, urge that we uphold rule 468 as the proper application of article XIII A to oil and gas properties. These parties consist of the State Board of Equalization, the Assessor of Los Angeles County (Alexander Pope), the County of Kern, the County of Monterey and its Assessor (Donald P. Stewart), and a number of Kern County school interests.

Before we proceed with consideration of the contentions on appeal, the significance of this case may be put in perspective by reference to some facts and figures presented to the trial court. As of the 1980 lien date there were 1,293 oil and gas producing properties in Los Angeles County. On the 1980 lien date those properties had a cumulative rule 468 value in excess of $2.5 billion. Under the prearticle XIII A method of valuation those interests would have been valued in excess of $7 billion. If the position of the appellant oil and gas interests were accepted those properties would have

been valued at less than $1.1 billion without an allowance for depletion, and at under $700 million if depletion were allowed. Even with a 1 percent maximum tax rate these differences in valuation translate into millions of dollars of annual tax liabilities and revenues. Further, it was shown that in the years 1978 through 1980 Kern County's tax revenues were in excess of $68 million more under rule 468 than they would have been if the appellant oil and gas interests' position were accepted.

## DISCUSSION

### I. *Does Article XIII A Apply to Oil and Gas Properties?*

The appellant assessors contend that article XIII A does not apply to oil and gas properties. This contention is based upon the already judicially noted ambiguities in article XIII A (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at pp. 244-245), and the research and supporting testimony of Mr. William H. Keller, an attorney who specializes in legislative history and intent. Mr. Keller conducted a search for preelection documents relating to Proposition 13, and ultimately collected 1,032 such documents. He analyzed the documents and discovered thousands of references to such terms as "home," "house," "renters," and words related to business, industry and commerce. He found only six references to oil and gas. From this relatively low incidence of the mention of oil and gas interests, and the content of the various preelection documents collected, Keller formed the opinion that the average voter would have believed Proposition 13 would apply to surface uses of property, meaning land and buildings, and not to mineral rights. On appeal the assessors argue that due to the unique nature of the interests involved and the latent and patent ambiguities in article XIII A, the measure should not be construed to include those interests.

We must reject this contention. We concede that Mr. Keller conducted a thorough search for indications of the intent behind Proposition 13, but his research establishes only that oil and gas interests were not the subject of much of the preelection discussion. Significantly absent from those materials is any indication that the measure would not apply to oil and gas interests. Arguments cannot supply what is missing from the language of the measure, and this court is not at liberty to add provisions to the Constitution. (*Pugh* v. *City of Sacramento* (1981) 119 Cal.App.3d 485, 491 [174 Cal.Rptr. 119]; *Metropolitan Water District* v. *Dorff* (1979) 98 Cal.App.3d 109, 115 [159 Cal.Rptr. 211].) However wise we may believe such an exception to be, we cannot carve it out from article XIII A unless there is an affirmative indication of voter intent or language in the measure itself which is reasonably susceptible of such a meaning. Here we find neither. Article XIII A

applies to "real property," and the ballot arguments submitted to the voters focused on the fact that the relief provided would apply to commercial, industrial, and business property. (Ballot Pamp., Primary Elec., (June 6, 1978) pp. 57-59.) Under these circumstances it is clear that the electorate knew and intended the measure to apply to commercial real property and, in view of the time-honored treatment in this state of oil and gas interests as taxable real property, we cannot hold that the voters in some unexpressed way sought to exempt these interests from the tax relief provided in article XIII A.

Article XIII A was intended to provide broad real property tax relief to owners of commercial and business properties as well as to homeowners. In the absence of some affirmative indication that such relief was intended to be denied to owners of oil and gas interests, we are unable to exclude them from the relief provided. Accordingly we hold that article XIII A applies to oil and gas interests.

II. *Is Rule 468 a Correct Interpretation of Article XIII A as Applied to Oil and Gas Properties?*

Article XIII A converts California from a current-value method of taxation to an acquisition-value system of taxation. (*Amador Valley Joint Union High Sch. Dist.* v. *State Bd. of Equalization, supra,* 22 Cal.3d at p. 236.) All real property is valued when it is purchased, newly constructed, or a change of ownership occurs, and thereafter the taxable value may be increased no more than 2 percent per year. For implementation purposes all persons who acquired property prior to 1975 are deemed to have purchased it in 1975. (*Ibid.*) "This 'acquisition value' approach to taxation finds reasonable support in a theory that the annual taxes which a property owner must pay should bear some rational relationship to the original cost of the property, rather than relate to an unforeseen, perhaps unduly inflated, current value." (*Id.,* at p. 235.) Upon this basis article XIII A survived attack on equal protection principles. (*Ibid.*)

It should be apparent to anyone who has read this far that an acquisition-value method of taxation is, at a minimum, problematical in relation to oil and gas interests. In *Amador,* the Supreme Court cited a typical example of an acquisition value basis: "For example, a taxpayer who acquired his property for $40,000 in 1975 henceforth will be assessed and taxed on the basis of that cost (assuming it represented the then fair market value). This result is fair and equitable in that his future taxes may be said reasonably to reflect the price he was originally willing and able to pay for his property, rather than an inflated value fixed, after acquisition, in part on the basis of sales to third parties over which sales he can exercise no control. On the other

hand, a person who paid $80,000 for similar property in 1977 is henceforth assessed and taxed at a higher level which reflects, again, the price he was willing and able to pay for that property. Seen in this light, and contrary to petitioners' assumption, section 2 does not unduly discriminate against persons who acquired their property after 1975, for those persons are assessed and taxed in precisely the same manner as those who purchased in 1975, namely, on an acquisition value basis predicated on the owner's free and voluntary acts of purchase." (*Id.*, at p. 235.)

The typical home buyer, or for that matter the buyer of commercial real property, agrees to pay a lump sum amount based upon existing market values. In contrast, the vast majority of oil and gas interests are created through leases under which the lessee agrees to pay an annual royalty based upon production rather than a lump sum amount. "It may be stated in passing that . . . the full consideration to the lessor is . . . the royalties in the lease." (*Jones* v. *Interstate Oil Corp.* (1931) 115 Cal.App. 302, 311 [1 P.2d 1051].) These royalties are in the nature of rent and are a part of the purchase price of the lease. (*Atlantic Oil Co.* v. *County of Los Angeles, supra,* 69 Cal.2d at pp. 600-601; see also Comment, *The Oil and Gas Lease in California: Still a Landlord-Tenant Relationship?* (1982) 13 Pacific L.J. 485.) The value of the interests of the lessor and the lessee are directly dependent upon production, and due to the fugacious nature of the minerals involved, the leases are subject to forfeiture for failure of the lessee to work the property diligently. (*Acme Oil and Mining Co.* v. *Williams, supra,* 140 Cal. at pp. 685-686.) From this perspective oil and gas interests might be said to be subject to continuous acquisition, and full value of the acquisition price, like the ultimate total recovery of oil and gas, cannot be known for certain until abandonment of the property.

It is apparent that the disjointed application of article XIII A to oil and gas interests is one of the imprecise and ambiguous particulars of the measure referred to by the court in *Amador, supra,* 22 Cal.3d at page 245. Because of that misfit, article XIII A must be construed in a liberal, practical, and common sense manner to meet changed conditions and the growing needs of the people. (22 Cal.3d at p. 245.) ■ Although enactments must ordinarily be construed in accordance with the plain and ordinary meaning of their words, the literal language of the measure may be disregarded to avoid absurd results and to fulfill the apparent intent of the framers. (*Ibid.*) ■ And, importantly, it is subject to legislative and administrative interpretation and those interpretations are entitled to great weight from the courts. (*Id.*, at p. 246.)

■ Our review of all of the factors presented leads us to conclude that rule 468 is an appropriate interpretation of article XIII A as it relates to oil

and gas interests. Such interests simply have no real parallel with other types of real property. (See *Graciosa Oil Co.* v. *Santa Barbara, supra,* 155 Cal. at p. 145.) The typical "acquisition cost" of such an interest is nothing but a promise for a future payment, and if contingent, of an undertermined amount. (*Id.,* at pp. 144-145.) The typical initial "acquisition value" is nothing, for value is dependent upon continuous, diligent, and successful development and production. (*Acme Oil and Mining Co.* v. *Williams, supra,* 140 Cal. at p. 684.) In establishing an acquisition-value system of taxation the People expressly provided for reassessment at full value when property is purchased, newly constructed, or a change of ownership has occurred. (art. XIII A, § 2, subd. (a).) There are aspects of each of these exceptions continuously present in the operation of an oil and gas lease. As oil and gas are extracted the right to remove them must be "purchased" by payment of the royalty; the oil and gas previously at large undergo a "change of ownership" when they are reduced to the personal property of the producer; and the derivation of value from the property requires continuous work which is similar to "new construction."[12] While the operation of an oil and gas lease may not come within the literal language of section 2, subdivision (a), it is clearly within the penumbra of intent established through the use of those qualifiers.

The acceptance of the position of the oil and gas appellants in this case would lead to manifestly absurd and unintended results. Since these interests generally have no value when initially acquired and are typically assessed at a zero or nominal value during the discovery and development process, the application of article XIII A in the manner sought by the oil and gas interests would preclude real property taxation on any oil and gas interest created after the 1975 assessment, as well as on any interest which had not been developed to "paying quantities" prior to that year.[13]

---

[12]In fact, the operation of an oil and gas lease is the opposite of "construction." Construction means to make or form by combining parts; to build. (Webster's New Collegiate Dict. (1977 G. & C. Merriam Co.) "construct" p. 243.) The operation of an oil and gas lease is an extraction process, and extraction means to draw forth; to withdraw; or to separate. (Webster's, *op. cit. supra,* "extract" p. 406.) Although the end result of the processes may differ, their nature is the same with regards to the purposes of article XIII A, since each use physical force (work) to rearrange the physical nature of the properties for the purpose of enhancing the value of the property right. Thus the operation of an oil and gas property is similar to construction, although that is not a word which is often used in reference to oil and gas interests.

[13]A typical example of this latter result is Kern County property number 183-210-10 (West Petroleum), owned by McFarland Energy, Inc. The 1975 assessment gave that oil and gas interest a nominal value of $400. By 1979 the property had reached paying quantity production and the rule 468 value was $24,620, and the 1980 rule 468 value was $174,304. Nevertheless, McFarland insists that through a literal application of article XIII A it is entitled to be taxed as though the property's full cash value was $416 in 1979, and $424 in 1980.

Moreover, even the oil and gas interests "grandfathered" into the property tax system due to their having reached paying quantity production by 1975 must ultimately cease to be subject to real property taxation. This is because the very nature and value of the interest lies in a use which is calculated to deplete and ultimately destroy the value of the interest. This would occur by the year 1985 if depletion were allowed from the 1975 proved reserves, and even if the concession of the oil and gas appellants (that such depletion is to be allowed only when current value drops below the 1975 adjusted base value of the interest) were accepted, the oil and gas industry must ultimately obtain total property tax exemption on these valuable property interests. We find nothing in the language of article XIII A, or in the preelection discussions, which would support such an interpretation of article XIII A. The measure was intended to provide broad property tax relief, but it was not intended to exempt particular taxpayers from property tax.

Article XIII A, as the oil and gas appellants would have us construe it, would be inconsistent with article XIII, section 1, subdivision (a), which provides that unless otherwise provided by the state Constitution or the laws of the United States, "[a]ll property is taxable." Nothing in the language or history of article XIII A indicates that it was intended as an exemption measure, and we think the framers could have spoken in clear and unambiguous language had that been their intent. If the measure were construed as the oil and gas appellants would have it, then it must operate as an implied repeal of article XIII, section 1, subdivision (a). But "neither the language nor the circumstances surrounding the passage of [Proposition] 13 rebuts the established presumption of constitutional construction disfavoring a repeal by implication." (*State Bd. of Equalization* v. *Board of Supervisors* (1980) 105 Cal.App.3d 813, 822 [164 Cal.Rptr. 739]; citation omitted.) Consequently, "Proposition 13 did not repeal or in any way alter the provisions of article XIII, which presently contains 33 separate sections. Thus, article XIII, section 1, must be given effect." (*Ibid.*) Rule 468 recognizes the essential nature of an oil and gas interest. The holder of such an interest has the right to remove oil and gas in paying quantities, and paying quantities are defined and limited by the concept of proved reserves. Additions to proved reserves are additions to the property right. (See *Chandler* v. *Hart* (1911) 161 Cal. 405, 414 [119 P. 516].) The rule values the proved reserves when they are included within the property interest and thereafter gives the taxpayer the benefit of article XIII A, but does not blindly ignore the fact that additions to the proved reserves are additions to the property right. In doing so the rule gives oil and gas producers the benefits of the tax relief article XIII A was enacted to provide without reaching the absurd results we have described. Consequently we reject the arguments of the oil and gas appellants that rule 468 violates article XIII A because it permits

the taxable value of oil and gas properties to be increased due to additions to the proved reserves.

We must also reject the arguments of the appellant assessors that annual reassessment is required for the entire interest. The precise nature of the property interest in uncaptured oil and gas beneath the surface has never been clearly defined and is subject to refinement. (*People* v. *Associated Oil Co.*, *supra*, 211 Cal. at p. 105.) So long as California had a current-value system of property taxation it was unnecessary to define for taxation purposes the nature of the taxable interest, but when the voters enacted an acquisition system of taxation it became necessary to define more clearly the taxable interest in an oil and gas property. Rule 468 does that by recognizing that the value of an oil and gas property lies in the proved reserves. Additions to the proved reserves constitute additions to the property right, but to permit reassessment of the existing proved reserve when it becomes more valuable due to inflation would violate the terms of article XIII A. The Board thus properly determined that existing proved reserves may not be increased in value more than 2 percent per year.

■ We also reject the contention of the appellant assessors that oil and gas producers may not be allowed reductions in value of the existing proved reserves due to depletion from production. This argument is based upon Revenue and Taxation Code section 51 which provides that for each lien date the taxable value of real property is the lesser of its base year value compounded for inflation not to exceed 2 percent, or its full cash value taking into consideration a decline in value due to damage, destruction, depreciation, obsolescence or other factors. This section implements article XIII A, section 2, subdivision (b), which expressly provides for reassessment "to reflect substantial damage, destruction or other factors causing a decline in value." Under section 51 real property is treated as a taxable unit, and the statute recognizes that the market value of a taxable unit may increase despite damage or destruction. But we have already held that, due to the unique nature of oil and gas interests, those property rights cannot be treated in a manner identical to other types of property. The Board has elected to measure the value of an oil and gas interest by the value of the proved reserves and to treat additions to the proved reserves as additions to the property right. It was proper for the Board to consider reductions from the proved reserves due to depletion as reductions from the taxable property right.

In summary, we agree with the trial court that rule 468 is a valid and enforceable implementation of article XIII A as it applies to oil and gas interests.

III. *Due Process and Equal Protection.*

We finally address and reject contentions that article XIII A and rule 468 violate principles of due process and equal protection. In *Amador,* the Supreme Court rejected contentions that article XIII A unlawfully discriminates between different taxpayers. (22 Cal.3d at pp. 232-237.) The appellant assessor of Kern County contends that the holding of *Amador* does not apply to oil and gas interests due to the potential of vast increases in value of such properties, and the fact that the terms "purchase," "newly constructed," and "change of ownership" are not likely to trigger reassessment of such properties. Amerada Hess contends that rule 468 treats oil and gas interests differently than other types of property, and that such treatment "makes no sense," and is "indefensible."

As the *Amador* court noted, the states have large leeway in making distinctions and drawing lines in order to produce what is, in their judgment, a reasonable system of taxation. (*Id.,* at pp. 233-234.) A state tax law is not arbitrary although it discriminates in favor of a certain class if the discrimination is founded upon a reasonable distinction or a difference in state policy. (*Ibid.*) To resolve the issues presented here it is sufficient that we note that the unique nature of oil and gas interests not only permits but compels that they be treated differently than other forms of property for taxation purposes. We are satisfied therefore that article XIII A, as implemented by rule 468, does not unlawfully discriminate either for or against oil and gas producers.

Respondents State Board of Equalization and the Assessor of Los Angeles County are awarded their costs of appeal. All other parties shall bear their own costs.

The judgment is affirmed.

Carr, Acting P. J., and Sims, J., concurred.