126 Cal.Rptr.2d 585 (2002)
103 Cal.App.4th 172
James W. MAPLES, as Assessor/Recorder, etc., Plaintiff and Appellant,
v.
KERN COUNTY ASSESSMENT APPEALS BOARD, Defendant and Respondent; Occidental of Elk Hills, Inc., Real Party in Interest and Appellant.
No. F038176.
Court of Appeal, Fifth District.
October 29, 2002.
Rehearing Denied November 25, 2002.
Review Denied January 15, 2003.
*587 Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Steven L. Mayer, San Francisco; B.C. Barman, Sr., County Counsel, John M. Gallagher, Chief Deputy County Counsel, and Jerri S. Bradley, Deputy County Counsel, for Plaintiff and Appellant.
Rodi, Pollock, Pettker, Galbraith & Cahill, John D. Cahill, Cris K. O'Neall, C. Stephen Davis, Robert C. Norton, Wade E. Norwood, Los Angeles; Morrison & Foerster, Thomas H. Steele, Peter B. Ranter, San Francisco, John Sobieski, Los Angeles, Pilar M. Sansone; Clifford & Brown and Patrick J. Osborn, Bakersfield, for Real Party in Interest and Appellant.
Mayer, Brown, Rowe & Maw, Gregory R. McClintock, Los Angeles, and Brian E. Wall for Western States Petroleum Association, California Independent Petroleum Association and Independent Oil Producers' Agency as Amici Curiae on behalf of Real Party in Interest and Appellant.
No appearance for Defendant and Respondent.

*586 OPINION
VARTABEDIAN, Acting P.J.
This appeal concerns the valuation of petroleum and natural gas rights as taxable real property interests. Appellant James W. Maples (Assessor) appeals from a judgment denying a petition for writ of administrative mandate. He petitioned for the writ in his capacity as Assessor/Recorder of the County of Kern. Assessor sought to overturn a decision of respondent Kern County Assessment Appeals Board (AAB) reducing Assessor's valuation of certain property owned by real party in interest Occidental of Elk Hills, Inc. (Occidental), from an assessed value of $3.65 billion to an adjusted value of $1,921 billion. Occidental cross-appeals from the trial court's denial of its motion for statutory attorney fees. We will reverse the judgment and direct the trial court to grant the writ, in part. Because Occidental has not prevailed in the underlying action, its cross-appeal is moot.

Facts and Procedural History
In 1912, the United States established the "Naval Petroleum Reserve Numbered 1" in Kern County (the Reserve). The Reserve comprises 36,922.49 acres and is approximately 78 percent of the Elk Hills oil field, one of the top 10 petroleum fields in the continental United States.
In 1996, Congress directed the sale of the Reserve. (See National Defense Authorization Act for Fiscal Year 1996, Pub.L. No. 104-106, §§ 3411-3415 (Feb. 10, 1996) 110 Stat. 186, 631-635, reprinted at Historical and Statutory Notes, 10 U.S.C.A. (1998 ed.) foll. § 7420 pp. 195-199 (Authorization Act).) Congress directed the United States Department of Energy (DOE) to obtain a detailed analysis of the petroleum reserves on the property (Authorization Act, § 3412(f)(3)), solicit offers for purchase of the property pursuant to terms contained in a draft sale contract (id. at § 3412(e)(2) & (f)(1)), and sell the Reserve to the highest responsible bidder (id. § 3412(f)(2)). Congress also directed DOE to cause the Reserve to be appraised by independent appraisers to determine its value to the government under continued DOE ownership, for the purpose of establishing a minimum acceptable bid for the property. (Id., § 3412(d)(1).) DOE was required to "make all technical, geological, *588 and financial information relevant to the sale of the reserve available to all interested and qualified buyers upon request." (Id., § 3412(c).) DOE required that prospective bidders certify they had not and would not collude with other bidders; the identity of all bidders was kept secret from one another.
After a lengthy process, Occidental was determined to be the successful bidder at $3.65 billion. The sale contract permitted DOE, through its contract operator, to continue to produce oil and gas from the Reserve until the closing of the sale, with a reduction of the purchase price based on the value of petroleum extracted during that period. (See Authorization Act, § 3412(h).) On February 5, 1998, the sale closed at an adjusted price of $3.53 billion.
Occidental reported the sale to Assessor and, after extensive negotiations concerning release of information and concerning valuation methodology, Assessor established the base-year fair market value of the property at $3.65 billion. (The Reserve was broken into 68 parcels for assessment purposes, but this allocation is not relevant to our discussion. We will use gross figures for the entire property, as do the parties.) This value was apportioned between the value of surface rights (at $100 per acre, totaling approximately $3.7 million) and the value of mineral rights. To the latter, Assessor allocated the value of $3,646,261,313.
Occidental appealed the valuation of the mineral interest to the AAB. As relevant to the present appeal, the dispute before the AAB focused on three issues. First, did the purchase price paid by Occidental establish prima facie the fair market value of the property pursuant to Revenue and Taxation Code section 110, subdivision (b)?[1] Second, allocating the burden of proof of value in accordance with the answer to the first question, was value required to be established pursuant to rule 468 of the State Board of Equalization (SBE) (Cal.Code Regs., tit. 18, § 468) (rule 468) or were alternative methods of valuation available to appraise the property? Third, applying the permissible methods of valuation, what was the value of the mineral interest component of the Reserve?
Following a hearing, the AAB determined by written order that the purchase price did not establish a prima facie value for the property, that rule 468 was the mandatory method for determining the value of the mineral interest, and that Occidental's methodology for determining value under the rule was the correct one. Consequently, the AAB concluded the mineral *589 interest had a fair market value of $1,921 billion.
Assessor petitioned the superior court for a writ of mandate pursuant to Code of Civil Procedure section 1094.5. After proceedings before it, the court issued its statement of decision and order denying the petition. The court concluded the AAB had erred in failing to apply the presumption of fair market value established in Revenue and Taxation Code section 110, subdivision (b) (hereafter, section 110(b)), but that Occidental had rebutted that presumption by establishing the value of the mineral interest in accordance with Occidental's interpretation of rule 468. Accordingly, the court concluded the AAB reached the correct result in establishing the value of the mineral interest at $1,921 billion. The court denied Occidental's request for an award of attorney fees.
Assessor filed a timely notice of appeal; Occidental filed a timely cross-appeal from the order denying an award of attorney fees.[2]

DISCUSSION

I. Standard of Review and Issues Presented
This appeal centers upon the methodology of valuation for the taxpayer's property. This is a question of law subject to our independent review. (Bret Harte Inn, Inc. v. City and County of San Francisco (1976) 16 Cal.3d 14, 23, 127 Cal.Rptr. 154, 544 P.2d 1354.) We must determine "whether the challenged method of valuation is arbitrary, in excess of discretion, or in violation of the standards prescribed by law." (Ibid.; see also Maples v. Kern County Assessment Appeals Bd. (2002) 96 Cal.App.4th 1007, 1013, 117 Cal.Rptr.2d 663.)
More particularly, in the present case we must determine whether the AAB (1) correctly construed section 110(b) as inapplicable to a sealed-bid auction of real property; (2) correctly determined that rule 468 provides the exclusive means of appraising oil and gas property; and (3) correctly construed rule 468 as requiring appraisal by the "income stream" method applied solely to "proved reserves" of oil and gas on the subject property.
In addition, we must determine whether substantial evidence supports the AAB determination of the value of the property, by whatever standard that value must be determined. (Maples v. Kern County Assessment Appeals Bd., supra, 96 Cal. App.4th at p. 1013, 117 Cal.Rptr.2d 663; Dennis v. County of Santa Clara (1989) 215 Cal.App.3d 1019, 1026, 263 Cal.Rptr. 887.)
Occidental contends, as it did below, that section 110(b) is inapplicable to a purchase resulting from a sealed-bid procedure. In addition, it argues that even if the purchase price established the prima facie value of the property, the evidence clearly rebutted the section 110(b) presumption. In support of these arguments, Occidental contends the terms of its purchase of the Reserve were not "negotiated" by the parties and that the uncontroverted evidence shows that the purchase price included "unproved" oil and gas reserves, which are not considered in establishing the value of California oil and gas properties.[3]

*590 II. The Presumed "Full Cash Value" of the Property
California Constitution, article XIII, section 1, provides that all property "is taxable and shall be assessed at the same percentage of fair market value," with certain exceptions not relevant here. California Constitution, article XIIIA, section 1, places certain restrictions on the assessment of taxes on real property and does so by reference to the "full cash value" of the property. Section 2(a) of article XIIIA defines "full cash value" for properties purchased after 1975 as "the appraised value" of the property at the time of purchase. Where the full cash value is established upon purchase and sale of the property, the term "full cash value" has the same meaning as fair market value measured at the date of such purchase. (Blackwell Homes v. County of Santa Clara (1991) 226 Cal.App.3d 1009, 1013, 277 Cal.Rptr. 251.)
Once established at the date of purchase, the "full cash value" becomes the base value for purposes of ad valorem property taxation. The base value can be raised in subsequent years to account for inflation, but only by a maximum of 2 percent per year. (Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization (1978) 22 Cal.3d 208, 220, 149 Cal.Rptr. 239, 583 P.2d 1281.)
Section 110(b), set forth in full in footnote 1 above, states that the "full cash value" of property is "the purchase price paid in the transaction unless it is established by a preponderance of the evidence that the real property would not have transferred for that purchase price in an open market transaction. The purchase price shall, however, be rebuttably presumed to be the `full cash value' or `fair market value' if the terms of the transaction were negotiated at arms length between a knowledgeable transferor and transferee neither of which could take advantage of the exigencies of the other."
Occidental contends the purchase price in the present case does not establish a presumptive fair market value because the transaction was not "negotiated." Occidental acknowledges that "whether the parties acted at `arms length,' that is, whether the parties were independent, unrelated, not under compulsion, and had full information about the subject property ... [is] not disputed...."
In order for the terms of the transaction to have been "negotiated" for purposes of section 110(b), according to Occidental, the parties must engage in "give and take" or "bargaining" activity. Here, Occidental asserts, "the transaction was on a `take-it-or-leave-it' basis."
As Occidental recognizes, the word "negotiated" has several different meanings. Certainly one of those meanings, as is focused upon by Occidental, is the active process of bargaining. In our view, however, section 110(b) does not require an active process of bargaining to satisfy the requirement that "the terms of the transaction were negotiated at arms length." Rather, "negotiated" in the statute means *591 simply "arranged" or "concluded": the phrase "the terms of the transaction were negotiated at arms length" is merely a more ornate way of saying "the transaction was arm's length."
This meaning is entirely consistent with both common and legal usage of the word "negotiate." Webster's Third New International Dictionary (1986) at page 1514, states as one of its definitions of "negotiate": "to communicate or confer with another so as to arrive at the settlement of some matter...." Similarly, one of the definitions of "negotiate" provided by Black's Law Dictionary (7th ed.1999) at page 1059 is "[t]o communicate with another party for the purpose of reaching an understanding."
In other words, section 110(b) does not, merely through use of the phrase "terms were negotiated," require "bargaining," "give and take" or compromise by the parties in order to effectuate a transaction that establishes a presumptive fair market value.
From an historical perspective, the construction of the statute argued by Occidental would be unfounded. Section 110(b) was adopted in 1988. Introduced as Assembly Bill No. 3382, the act sought to codify existing rule 2 of the State Board of Equalization (SBE) (Cal.Code Regs., tit. 18, § 2), by which SBE had adopted a purchase price presumption for fair market value. (See Sen. Rev. and Taxation Com., Analysis of Assem. Bill No. 3382 (1988-1989 Reg. Sess.) Aug. 3, 1988, p. 2.) The Senate Revenue and Taxation Committee noted that under then-existing practice "for practically all home transactions the amount enrolled by the assessor is the purchase price.... [¶] The objective of ... this bill [] is to make it more difficult for assessors to use a value other than purchase price when a complex transaction includes real property as well as other related property...." (Id., p. 3.)
Accordingly, the purpose of the bill was to continue and expand existing practice where "the terms of the transaction were negotiated at arms length." Yet, in the typical home sale, particularly during periods of strong sales activity, there is little or no negotiation: the buyer submits a written offer through his or her broker and the seller accepts or rejects the offer.
Obviously, in some instances there are counteroffers exchanged and the transaction involves bargaining or give and take. The point is, however, that such bargaining is not an essential element of the typical arm's length transaction resulting in the purchase price of a residence, which purchase price is the paradigm for section 110(b)'s presumption of fair market value.
In the typical home sale, the terms of sale are "settled" as a result of "communications" conducted at arm's length, but the terms are not the result of "bargaining" or "haggling" at arm's length. Occidental's interpretation of section 110(b) would exclude from the protection of section 110(b) the typical home purchaser, the very person the author of the bill sought to protect. (See Sen. Rev. and Taxation Com., Analysis of Assem. Bill No. 3382, op. cit. supra, pp. 2-3.)
The cases cited by Occidental for the proposition that active bargaining is essential to "negotiation" provide no support for its interpretation of section 110(b). For example, Delbon v. Brazil (1955) 134 Cal. App.2d 461, 285 P.2d 710 involved a real estate broker's claim for commissions arising from a sale that occurred after the expiration of the listing contract. The listing contract provided for the payment of a commission if the sale occurred within 30 days after the expiration of the listing agreement and the sale was to any person with whom the broker "had `negotiated for *592 a sale' during that period." (Id. at p. 464, 285 P.2d 710.) The appellate court concluded it was an issue for the finder of fact whether the broker had "negotiated" with the purchaserthat is, in the Delbon context, whether the broker's efforts had been sufficient to render a prospect a "likely purchaser." (Ibid.) No question is presented in the case now before us concerning the degree of participation by a third party in Occidental's purchase of the Reserve. Accordingly, Delbon sheds no light on section 110(b)'s use of the word "negotiated."
The other California case cited by Occidental, Markborough California, Inc. v. Superior Court (1991) 227 Cal.App.3d 705, 277 Cal.Rptr. 919, actually adopts a meaning of "negotiate" quite similar to that which we adopt above. Markborough involved a statute permitting limitation-of-liability clauses in construction contracts despite a related statutory restriction on such clauses. The statute under consideration (Civ.Code, § 2782.5) provided that nothing in the related statute prevented the parties to a construction contract "from negotiating and expressly agreeing with respect to" the clauses in question. (Markborough supra, at pp. 709-710, 277 Cal.Rptr. 919.) The Markborough appellant contended this clause required actual discussion and specific agreement concerning the clause. (Id. at p. 714, 277 Cal. Rptr. 919.)
After setting forth various dictionary definitions of "negotiate," the Court of Appeal stated, in language appropriate to the present case: "In our view, the word `negotiate' has no precise definition and means nothing more than the process by which parties come to or do not come to an agreement. A negotiation can be as simple as the submission of an offer which is accepted without qualification or comment. The negotiation process, on the other hand, might be more complex and consist of numerous offers, counteroffers and modifications, discussions and other communications. Obviously, what constitutes 'negotiation' in any one case cannot be fixed with any degree of specificity and we find no evidence that the Legislature intended any precise form of negotiation. Accordingly, all that reasonably can be required for `negotiation' is a fair opportunity for both parties to accept, reject or modify the other's offers or demands." (Markborough California, Inc. v. Superior Court, supra, 227 Cal.App.3d at p. 714, 277 Cal.Rptr. 919.)
Occidental makes much of the fact that the detailed terms of an acceptable bid for the Reserve were forced upon it by DOE, thereby negating any concept of "negotiated terms."
In some instances, terms of a sale in fact are imposed upon one party by the other. For example, a property owner has no choice but to sell his or her property at the fair market price in a properly conducted condemnation proceeding. Similarly, a subsidiary corporation might be forced to accept terms for purchase of property from its parent corporation; as a controlled entity it might have no choice in the matter.
Occidental, to the contrary, was not forced to accept the particular terms of purchase for the Reserve except in the context of its free decision to enter into the purchase in the first instance. It had the opportunity to bid or not bid on the property, and the resulting terms of sale were "negotiated" within the meaning of section 110(b) and within the meaning ascribed to that term in Markborough California, Inc. v. Superior Court, supra, 227 Cal.App.3d at page 714, 277 Cal.Rptr. 919.
Flaws in Occidental's argument concerning "negotiation" are further illustrated by a reference to classical economic theory. When price is established in a perfectly *593 competitive market, neither the buyer nor the seller can affect the price in any way. (Hyman, Economics (1989) p. 214.) The purchase and sale of goods in such a setting is purely a "take it or leave it" proposition for any individual buyer or seller; negotiation is pointless because there is always, in economic theory, another buyer or seller willing to act at the market price if one of the present parties does not choose to do so. Yet no one would contend that the price for goods set through the forces of a perfectly competitive market was not the fair market value of the particular item.
Occidental contends this court's decision in Guild Wineries & Distilleries v. County of Fresno (1975) 51 Cal.App.3d 182, 124 Cal.Rptr. 96 establishes that "negotiate" requires "haggling" and actual give and take by the parties. We disagree.
First, Guild Wineries did not address the use of the phrase "terms were negotiated at arm's length," since the case preceded the Legislature's adoption of the purchase price presumption of section 110(b) by more than a decade. The Guild Wineries court summarized the law in 1975 as follows: "[W]hile a recent, open market, arm's length sale of a particular type of property may be a very important factor in determining its fair market value, the sale, by itself, does not provide sufficient, reliable data to enable the assessor to make an accurate valuation of that property [citation]; it is only a starting point in appraising the property." (51 Cal.App.3d at p. 187, 124 Cal.Rptr. 96.) By its adoption of section 110(b), the Legislature changed that rule. The sale, by itself, is now sufficient to establish the fair market value in the absence of evidence the property would not have sold for that price in an open market transaction.
Second, Occidental is simply wrong when it asserts that the Guild Wineries opinion "defined `negotiated' as `the haggling of the market' which must occur for a sale to be considered `market value.'"
The phrase "the haggling of the market" was used by the Idaho Supreme Court, in a quotation contained in Guild Wineries, to describe the phenomenon we have described above through which a competitive market establishes a price for goods that neither the seller nor the buyer can affect. (See Hyman, Economics, op. cit. supra, p. 214.) According to the Idaho court, only when "there have been numerous sales or exchanges of similar property ... may the inference arise that the equivalent arrived at by the haggling of the market is probably the price at which the property would be offered and accepted." (Janss Corp. v. Board of Equalization of Blaine Co. (1970) 93 Idaho 928 [478 P.2d 878, 881], quoted in Guild Wineries, supra, 51 Cal.App.3d at p. 187, 124 Cal.Rptr. 96.) As we have discussed above, such a perfectly competitive market is distinguished by the absence of individual "haggling" once price equilibrium is reached. In sum, Guild Wineries provides no basis to construe section 110(b) to require "bargaining" between the parties before the terms of a transaction can be described as "negotiated at arm's length."
Although not necessary to our conclusion that the purchase price presumption is applicable in the present case, we note that the record in this case clearly establishes that Occidental was permitted by the terms of the DOE's request for bids to condition its purchase offer on different terms than those specified by DOE. The solicitation for bids promulgated by DOE stated that "[f]ollowing the submission of offers ... discussions/negotiations will be conducted with those qualified offerors whose offers appear to maximize value to the Government." Further, DOE reserved "the right to negotiate with one or *594 more parties during this phase of the offer evaluation/negotiation process." To that significant extent, this transaction departs from a traditional "sealed bid" auction model, despite Occidental's continuing characterization of the transaction in that manner.
Occidental's corporate lawyer testified that the sales agent for DOE encouraged bidders not to make changes in the DOE draft contract, thereby limiting Occidental's ability to negotiate favorable terms for the purchase. Similar constraints commonly arise in simpler real estate transactions. For example, a prospective homebuyer may prefer that the seller put in new carpet so that the cost thereof can be included in the buyer's long-term financing. The brokers, especially in a "hot" market, might counsel the buyer to keep his or her offer "clean" by omitting such a modification of the standard terms of the form offer employed in the locality. The fact that a buyer makes a tactical decision to accept this advice does not mean the ensuing terms of purchase were not "negotiated at arm's length"; it simply means the buyer made a decision to offer terms attractive to the seller.
In the present case, the evidence shows that Occidental made a similar tactical decision to keep its offer "clean" in the hope of enhancing its chances of being the successful bidder for the Reserve. Such a decision was reasonable under the circumstances; the DOE solicitation of offers specifically warned: "Because some offerors may be eliminated from further consideration before discussions are held offerors are encouraged to submit offers at prices and on terms which maximize the value to the Government." (Original italics.)
DOE clearly adopted a tough negotiating position, but it is difficult to see how Occidental's well-considered response' to the solicitation does not, as a factual matter, constitute "negotiation," even in Occidental's restricted definition of that term. Occidental's corporate lawyer testified that it proposed changes in the DOE draft contract, although "far fewer" than the lawyer would have liked. Only some of the proposed changes to the contract were accepted by DOE; however, not even Occidental contends that success in negotiations by a purchaser is a criterion for a "negotiated" arm's length transaction.
Finallyand despite its concession that the question of the parties'"knowledge" under section 110(b) is not involved in the present appealOccidental contends that its purchase could not have been negotiated at arm's length because, in the present sealed-bid context, it lacked "information as to the identities and amounts others bid for [the] property." According to Occidental, "Economic theory requires market participants to have full information as to prices and the identities of other market participants in order to arrive at a competitive market value outcome." Occidental cites to economics textbooks in support of this claim.
To the extent Occidental means to contend that a buyer must know the identity and pricing position of other bidders seeking to make the same purchase in order for a purchase to be "negotiated," simple examples demonstrate this contention is incorrect. In transactions involving the purchase of residential real estate, stock through a stock exchange, used cars, and countless other everyday examples, either the seller declines to disclose, or the structure of the market makes it impossible to obtain, the information Occidental says it was lacking in the present case. Yet, clearly, the terms of such purchases would be "negotiated at arm's length" in any conceivable use of that term.
To the extent Occidental means to contend that a "knowledgeable" buyer under *595 section 110(b) needs to know generally the types of buyers and sellers of, and the range of prices paid for, items of like kind, we might well agree. The record in the present case, however, demonstrates that Occidental had an abundance of such information concerning the market for petroleum producing properties. As the trial court stated: "The bidding process included the provision of huge amounts of technical data, etc. to each of the potential bidders by the government. In addition, each potential bidder had access to the property and to further information on request to analyze its economic interests." (See also Authorization Act, at § 3412(c).)
As an aside to the legal question whether the formal requisites exist to establish the section 110(b) presumptive fair market value, it is of some interest to note that Occidental does not contend it overpaid for the Reservenowhere does it claim it did not get fair value in this multibillion dollar transaction. In fact, its corporate lawyer explicitly testified that the price Occidental paid for the Reserve represented fair market value "taking into account all of the factors that go into a buyer's and seller's mind and what they think they're purchasing at the time."
Instead, Occidental simply contends that part of that which it bought at fair market value was non-taxable property (in its view, "unproved reserves"), a question we address in the following sections. For purposes of the present section, we conclude the purchase price for the Reserve established a presumptive fair market value. The burden of proof was upon Occidental to establish a different fair market value. (See § 110(b).)

III. Rule 468

A. The Problem the Rule Sought to Address

The right to remove oil and gas from the ground is a property right, taxable as real property. (Lynch v. State Bd. of Equalization (1985) 164 Cal.App.3d 94, 103, 210 Cal.Rptr. 335.)[4] Oil and gas themselves are not owned by anyone until removed from the ground. (Id. at p. 102, 210 Cal.Rptr. 335.)
At the initial stages of exploration and development of an oil and gas field, there is usually little concrete information about the quantity and extractability of any oil and gas that may be present. As a result, the parties find it difficult to establish a price when an oil company seeks to buy or lease mineral rights from a property owner. Traditionally, therefore, the parties have entered into royalty agreements as the means of paying for the mineral rights: the parties agree that the oil company will pay for the mineral rights as and to the extent oil and gas are extracted. (Lynch v. State Bd. of Equalization, supra, 164 Cal.App.3d at p. 114, 210 Cal. Rptr. 335.)
Prior to the voters' adoption of California Constitution, article XIIIA in 1978, as Proposition 13, tax assessors were permitted to reappraise oil and gas fields annually. As oil and gas reserves were discovered and brought into production, fields were reappraised to capture the new value on the tax rolls. (Lynch v. State Bd. of *596 Equalization, supra, 164 Cal.App.3d at pp. 109-110, 210 Cal.Rptr. 335.)[5]
Under the regime of Proposition 13, however, routine annual reappraisals are not permitted: article XIIIA, section 2 requires the establishment of a "base year value" for real property, which may then be increased by no more than 2 percent annually unless the property is sold or there is new construction on the property. (Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, supra, 22 Cal.3d at p. 235, 149 Cal.Rptr. 239, 583 P.2d 1281.) Accordingly, in order to fit the intrinsically unknown value of oil and gas reserves into the requirement for establishment of base year value, without forfeiting the ability to tax such property by freezing the base year value of new or unexplored oil and gas fields at zero, the taxing authorities needed to reconceptualize the value of oil fields for tax purposes. (See Lynch v. State Bd. of Equalization, supra, 164 Cal.App.3d at pp. 109-110, 210 Cal.Rptr. 335.)

B. The Development of Rule 468

The SBE is charged by statute with ensuring that taxation is uniform throughout the state. (Gov.Code, § 15606.) SBE publishes rules and handbooks that govern and guide county tax assessors in, among other things, the valuation of property. (See Gov.Code, § 15606, subds. (c) & (e).) After the adoption of Proposition 13, SBE staff examined various areas in which problems might arise under the new regime. They saw the valuation of oil and gas properties as one such area.
In 1978, SBE adopted an emergency rule, rule 468, governing the valuation of oil and gas properties. Although that rule has undergone significant change as it reached its present form, we find it useful to examine both the original language of rule 468 and an interim version of the rule. Throughout the following quotations, we have placed certain phrases in italics to focus on those portions of the rule, and its modification, directly relevant to the issues before us.
The original version of rule 468 (hereafter the 1978 rule), as pertinent to our discussion, provided:
"468. Oil and Gas Producing Properties.

"Petroleum, natural gas, and other fluid hydrocarbons are natural substances of the earth, and are classified as land. The volume of these hydrocarbons that will be removed from the land consists of the amount that is classified at a given time as `proved reserves.' Proved reserves are the volumes of crude oil and natural gas which geological and engineering information shows, beyond reasonable doubt, to be recoverable in the future from oil and gas reservoirs under existing economic and operating conditions. The development of proved reserves by drilling and completing wells and by installing production systems constitutes an addition to real property and the production of oil and gas constitutes a removal of real property.
"(a) The full value of an oil or gas producing property is its base year full value adjusted for depletion of reserves ....
"(b) The base year of newly developed reserves shall be the date of completion of the well or the installation of the production system." (Emphasis added.)
*597 After further input from county assessors and representatives of the oil and gas industry, SBE amended rule 468 as an emergency measure in April of 1979; the new rule amended subsections (a) and (b) and added a new subsection (c). The amended rule was different from the original rule in its concept of the object of taxation; the new rule focused not on the oil and gas itself but upon the right to remove oil and gas from the land. The amended rule (hereafter the April 1979 rule), as relevant to our discussion, provided:
"468. Oil and Gas Producing Properties.
"Petroleum, natural gas, and other fluid hydrocarbons are natural substances of the earth, and are classified as land. The volume of these hydrocarbons that will be removed from the land consists of the amount that is classified at a given time as `proved reserves.' Proved reserves are the volumes of crude oil and natural gas which geological and engineering information shows beyond reasonable doubt, to be recoverable in the future from oil and gas reservoirs under existing economic and operating conditions. The development of proved reserves by drilling and completing wells and by installing production systems constitutes an addition to real property and the production of oil and gas constitutes a removal of real property.
"(a) The right to remove petroleum, natural gas, minerals referred to in Section [rule] 469 and other minerals from the earth is a taxable real property interest. Increases in recoverable amounts of minerals caused by changed physical or economic conditions constitute additions to such a property interest. Reduction in recoverable amounts of minerals caused by production or changes in the expectation of future production capabilities constitute a reduction in the interest....
"(b) The market value of a mineral property interest is determined by estimating the value of the volumes of mineral reserves which geological and engineering information indicate to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. Present and projected economic operating conditions shall be determined by reference to all economic factors considered by knowledgeable and informed persons engaged in the operation and buying or selling of such properties.

"(c) The unique nature of mineral property interests requires the application of specialized appraisal techniques designed to satisfy the requirements of Article XIII, Section 1, and Article XIIA, Section 2, of the California Constitution. To this end, the valuation of such properties and other real property associated therewith shall be pursuant to the following principles and procedures:
"(1) A base year value (market value) of the property shall be estimated as of lien date 1975 or as of the date a change in ownership occurs subsequent to lien date 1975.... Base year values shall be determined using factual market data such as prices and expenses ordinarily considered by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and other mineral-producing properties and the production therefrom. Once determined, a base year value may be increased no more than two percent per year.
"(2) Base year reserve values must be adjusted annually for the value of depleted *598 reserves caused by production or changes in the expectation of future production.
"(3) Additions to reserves established in a given year by discovery, construction of improvements, or changes in economic conditions shall be quantified and appraised at market value." (Emphasis added.)
(There then follows a methodology for valuing extracted reserves [as a measure of depletion] and added reserves for a given year, as well as a rule for recognizing decreases in value of the entire appraisal unit when the market value is less than the base year value. Note the absence of any reference to "proved reserves" in subsections (b) and (c)(1) prescribing the valuation methodology.)
As a result of dissatisfaction with the April 1979 rule, a committee of county assessors and petroleum industry interests met to suggest further amendments to the rule. Once again, SBE promulgated the resulting amendments as an emergency rule, effective July 2, 1979. The July 1979 rule changed the language of rule 468 in several relevant respects.
First, the introductory paragraph of the rule was deleted in its entirety. The first sentence of subsection (a) was modified to read: "The right to remove petroleum and natural gas from the earth is a taxable real property interest." The balance of subsection (a) was not changed.
Next, subsection (b) was modified to read as follows (additions are indicated with italics; there were no deletions): "(b) The market value of an oil and gas mineral property interest is determined by estimating the value of the volumes of proved reserves. Proved reserves are those reserves which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. Present and projected economic conditions shall be determined by reference to all economic factors considered by knowledgeable and informed persons engaged in the operation and buying or selling of such properties, e.g., capitalization rates, product prices and operation expenses."
Finally, there were minor editorial changes in subsection (c), none of which is pertinent to the present discussion. Subsection (c)(1) still does not refer to "proved reserves."
Rule 468, as modified in July 1979, applicable to the present case, reads as follows:
"(a) The right to remove petroleum and natural gas from the earth is a taxable real property interest. Increases in recoverable amounts of minerals caused by changed physical or economic conditions constitute additions to such a property interest. Reduction in recoverable amounts of minerals caused by production or changes in the expectation of future production capabilities constitute a reduction in the interest. Whether or not physical changes to the system employed in recovering such minerals qualify as new construction shall be determined by reference to Section 463(a).
"(b) The market value of an oil and gas mineral property interest is determined by estimating the value of the volumes of proved reserves. Proved reserves are those reserves which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. Present and projected economic conditions shall be determined by reference to all economic factors considered by knowledgeable and informed persons engaged in the operation and buying *599 or selling of such properties, e.g., capitalization rates, product prices and operation expenses.
"(c) The unique nature of oil and gas property interests requires the application of specialized appraisal techniques designed to satisfy the requirements of Article XIII, Section 1, and Article XIII A, Section 2, of the California Constitution. To this end, the valuation of such properties and other real property associated therewith shall be pursuant to the following principles and procedures:
"(1) A base year value (market value) of the property shall be estimated as of lien date 1975 in accordance with Section 460.1 or as of the date a change in ownership occurs subsequent to lien date 1975. Newly constructed improvements and additions in reserves shall be valued as of the lien date of the year for which the roll is being prepared. Improvements removed from the site shall be deducted from taxable value. Base year values shall be determined using factual market data such as prices and expenses ordinarily considered by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and other mineral-producing properties and the production therefrom. Once determined, a base year value may be increased no more than two percent per year." (Subdivisions (c)(2) through (c)(6) omitted.)[6]

C. The Applicability of Rule 468
Assessor contends rule 468 is wholly inapplicable in the present case because Occidental owns the entire fee interest. Assessor contends rule 468 only governs valuation of "a mineral property interest," not a fee interest.
Notwithstanding this contention on appeal, in his actual valuation of the Reserve, Assessor established a separate value for the mineral interest. Rule 468 required him to do so, and for good reason, as we explain.
Rule 468 states that oil and gas property interests are "unique" and require "the application of specialized appraisal techniques." (Rule 468(c).) The uniqueness arises from two aspects of petroleum producing properties.
First, petroleum is a depleting, nonrenewable resource. The value of a petroleum interest at any particular time is based on projections concerning the amount of petroleum likely to be produced from the property; in the absence of new discoveries of oil at the property, the value of the property decreases over time as existing petroleum is extracted. (Lynch, supra, 164 Cal.App.3d at p. 116, 210 Cal. Rptr. 335.) In the present case, the purchase price of the property was reduced by approximately $120 million to account for petroleum extracted between DOE's acceptance of Occidental's bid and the closing of the transaction some five months later.
Second, the total amount of petroleum that profitably can be extracted from a particular property can be accurately known only when the field is fully depleted. (Lynch, supra, 164 Cal.App.3d at p. 114, 210 Cal.Rptr. 335.) Not only is there geological uncertainty concerning the volume, location, and structure of petroleum reserves in a particular field, there are also economic and technological uncertainties (such as price fluctuations, technological advances, and increased or decreased environmental restrictions), all *600 of which interact to affect the value of a petroleum interest over the course of time. As a property is explored and developed, these uncertainties are increasingly resolved and, at some point, the property either attains new value as a producing field or proves worthless. (See Lynch, supra, 164 Cal.App.3d at pp. 106-108, 210 Cal.Rptr. 335.)
Subsection (c) of rule 468 (rule 468(c)) reflects SBE's recognition of these dual factors. It requires assessors to determine the market value of "the property." Then the assessor must determine the value of the "mineral interest" portion of the particular appraisal unit in the following manner: After determining "total unit market value" of the property and "the volume of reserves using current market data" (rule 468(c)(4)(A)), the assessor must subtract from the total market value that portion attributable to "land (other than mineral rights)" and improvements. The remainder is the "current value of taxable reserves" (rule 468(c)(4)(B)).
The calculated value for the petroleum interest on each appraisal unit is used as the basis both for reducing the value of the interest based on depletion (rule 468(c)(4)(D)) and for increasing the value based on addition of reserves (rule 468(c)(4)(E)) by "discovery, construction of improvements, or changes in economic conditions" (rule 468(c)(3)). In this manner, the rule accommodates both the uniqueness of petroleum properties, however owned, and the requirements of Proposition 13.
Assessor's contention that rule 468 does not apply at all to fee interests that contain petroleum reserves necessarily implies that the base year (acquisition) value of the fee interest is fixed for the unified parcel, and is subject to increase only for inflation as permitted by Proposition 13. This view of rule 468 was rejected in Lynch, supra, 164 Cal.App.3d at page 115 and footnote 13, 210 Cal.Rptr. 335, and we reject it here.
Rule 468, the constitutionality of which was affirmed in Lynch, contemplates that the base year value of the non-petroleum interest is fixed in accordance with Proposition 13, but the petroleum interest is subject to re-valuation based on changes in proved reserves, as defined in rule 468(b) and as calculated pursuant to rule 468(c). We now address in more detail the method by which rule 468 requires the value of petroleum properties to be established.

D. The Meaning of Rule 468

Assessor contends rule 468 provides merely one methodology for establishing the value of oil and gas properties. This contention is untenable in light of the express language of the rule itself: "The market value of an oil and gas mineral property interest is determined by ..." (rule 468(b)) and "Base year values shall be determined ..." (rule 468(c)(1)). Rule 468 clearly is mandatory and no other methods of valuation except those set forth by the rule. (See Gov.Code, § 15606.)
Occidental, by contrast, asserts not only that rule 468 establishes the sole methodology by which an assessor may assign a value to oil and gas properties, but also that the rule precludes the assessor from assigning any value whatsoever to "unproved reserves." This contention, likewise, is untenable.
The problem with Occidental's argument is evidenced by the April 1979 rule. There, value of the petroleum interest is established by "estimating the value of the volumes of mineral reserves which geological and engineering information indicate to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions. Present *601 and projected economic operating conditions shall be determined by reference to all economic factors considered by knowledgeable and informed persons engaged in the operation and buying or selling such properties." This is restated later in the April 1979 rule as a requirement that such property value "shall be determined using factual market data such as prices and expenses ordinarily considered by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and other mineral-producing properties and the production therefrom." This statement of methodology is, in its essence, a particularized version of the traditional standard of "fair market value," that is, a restatement with particular reference to the petroleum production industry.[7]
When we turn to the July 1979 rule, we see that the result, although somewhat masked by potentially confusing language, is no different: the assessor is still directed to make a determination of the fair market value of reserves using the criteria that would be used by knowledgeable buyers and sellers of properties bearing such reserves.
Potential confusion arises from the reintroduction into the July 1979 rule of the words "proved reserves," words also used both within the petroleum industry and in the initially promulgated rule. The source of the potential confusion is that "proved reserves" has a totally different meaning in the context of the July 1979 rule than in its industry usageand in its usage in the original rule 468, as adopted in 1978.
In the 1978 rule, "proved reserves" meant those reserves shown by engineering and geological data, "beyond reasonable doubt, to be recoverable in the future from oil and gas reservoirs under existing economic and operating conditions." (Italics added.) Industry standards similarly focus on the "here and now": As defined by the Society of Petroleum Engineers and the World Petroleum Congress, "Proved reserves are those quantities of petroleum which ... can be estimated with reasonable certainty to be commercially recoverable ... from known reservoirs and under current economic conditions, operating methods, and government regulations." (Definition approved by Board of Directors, Society of Petroleum Engineers, Inc., Mar. 7, 1997.) As the Securities and Exchange Commission characterized the phrase in documents before the AAB, "Proved reserves are limited to those quantities of oil and gas which can be expected, with little doubt, to be recoverable commercially at current prices and costs, under existing regulatory practices and with existing conventional equipment and operating methods." (Italics added in all quotations.)[8]
The July 1979 rule defines proved reserves in an entirely different manner. Proved reserves under the rule are those reserves shown with reasonable *602 certainty to be recoverable in the future taking into account present and expected technological and economic circumstances which are "considered by knowledgeable and informed persons engaged in the operation and buying or selling of such properties, e.g., capitalization rates, product prices and operation expenses." (Rule 468(b); see Phillips Petroleum Co. v. County of Lake (1993) 15 Cal.App.4th 180, 194, 18 Cal.Rptr.2d 765.) It is noteworthy that in adopting the July 1979 rule, reintroducing the term "proved reserves," the SBE did not change in any way the portion of the rule most clearly directing that county assessors use ordinary industry standards to determine the fair market value of petroleum producing properties: "Base year values shall be determined using factual market data such as prices and expenses ordinarily considered by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and other mineral-producing properties and the production therefrom."[9] (Rule 468(c)(1).)
Both Occidental's expert witness, Forrest Garb, and Occidental's internal evaluations establishing its bid price for the present property show clearly that industry appraisal standards involve consideration of petroleum reserves that, under industry definitions discussed above, fail to qualify as proved reserves. These "probable" and "possible" reserves are discounted in various ways to reflect that they are a riskier investment than proved reserves but they are, without any question, considered by "knowledgeable and informed persons" in valuing a petroleum property for purchase and sale, as we discuss in more detail below.
The SBE's departure from industry definitions of proved reserves was not inadvertent. Industry representatives pointed out the differences and requested modification of the rule to eliminate those differences. Staff acknowledged the differences in formal proceedings before the SBE and recommended retaining the conceptual framework of the interim rule, permitting the consideration of expected changes in the economics and technology of petroleum production. Presented with these varying viewpoints, SBE retained the broad "fair market value" standard of the April 1979 rule when it adopted the July 1979 rule.
It is true, of course, that SBE did amend rule 468 by adding the phrase "proved reserves" and by requiring that appraised reserves be "reasonabl[y] certain[]" of recovery in the future. After review of the administrative record of SBE proceedings to adopt and amend rule 468 *603 (an exhibit introduced as part of the present record), however, we conclude the modifications were not intended to substantially change the methodology for appraising petroleum properties for tax purposes. (See Martin v. California Mut. B. & L. Assn. (1941) 18 Cal.2d 478, 484, 116 P.2d 71 ["While an intention to change the law is usually inferred from a material change in the language of the statute [citations], a consideration of the surrounding circumstances may indicate, on the other hand, that the amendment was merely the result of a legislative attempt to clarify the true meaning of the statute"].)
A construction of rule 468 that rigidly adopted the petroleum industry's concept of proved reserves would lead to impermissible inequities in tax assessment. As the county's expert witness pointed out, "various properties have different ratios of proved developed producing to total" reserves. Under Occidental's view of rule 468, a property with 100 barrels of proved reserves by industry standards with no unproved reserves would have the same value for tax purposes as a property with 100 barrels of proved reserves and six million barrels of unproved reserves, even though those two properties would have drastically different values for knowledgeable buyers and sellers of petroleum-producing properties. Occidental suggests no significant policy reason why SBE would countenance such disparities, even if it were permitted to do so under article XIII, section 1 of the Constitution. (See also Gov.Code, § 15606, subd. (e) [SBE to promote uniformity in the assessment of property for purposes of taxation]; cf. letter from V. Walton, Chief, SBE Assessment Standards Div., to H. Bertholf dated Oct. 13, 1988.)
We conclude the July 1979 rule represents an implicit recognition by SBE that, on occasion, a purchaser may buy an oil and gas interest on a purely speculative basis despite the absence of any data supporting a conclusion that recovery of petroleum products from the land is reasonably certain under any foreseeable circumstances. In its determination not to attempt to place a taxable value on such speculation in petroleum interests, SBE again has made specific to this industry the general rule in fair market value determinations that such value is premised on objective market conditions, not merely on the purchase price paid by an idiosyncratic or otherwise unusual buyer. (See Pacific Mutual Life Ins. Co. v. County of Orange (1985) 187 Cal.App.3d 1141, 1148, 232 Cal.Rptr. 233.)
Occidental points to language in the seminal case of Lynch v. State Bd. of Equalization, supra, 164 Cal.App.3d at pages 104-105, 210 Cal.Rptr. 335, which states that in 1966 SBE adopted the petroleum industry's definition of proved reserves and that this definition has been carried forward into the present language of rule 468. The Lynch court cites the SBE Assessors' Handbook, section 566 in support of this proposition. However, the current version of section 566 of the handbook, adopted in 1996 and revised in 1999, specifically notes the difference between proved reserves for rule 468 purposes and proved reserves as defined by the petroleum industry. (SBE, Assessment of Petroleum Properties (1999 rev.) p. 4-2.)
We also consider it important to note that the meaning of the term "proved reserves'' was not an issue in Lynch. Instead, the issues were whether Proposition 13 applied at all to petroleum interests and whether the reassessment of value permitted by rule 468 violated the Constitution as amended by Proposition 13. (Lynch v. State Bd. of Equalization, supra, 164 Cal. App.3d at pp. 110-111, 210 Cal.Rptr. 335.)
*604 Finally, the Lynch court did not refer to the development of the language of rule 468 from its initial adoption to its final form, nor to the SBE administrative record (which may well have not been a part of the record before the Lynch court) specifically discussing the differences between the July 1979 rule and industry's definition of proved reserves.
Accordingly, we must view the Lynch court's discussion of the concept of proved reserves as dicta. We find that reevaluation of the concept of proved reserves on the record and in the context presented in the present case requires us to reach a different conclusion than that reached in Lynch. (See Lynch v. State Bd. of Equalization, supra, 164 Cal.App.3d at pp. 104-105, 210 Cal.Rptr. 335.)

IV. Failure to Overcome the Section 110(b) Presumption
We have seen above that the trial court concluded that the purchase price paid by Occidental to the DOE is presumptively the base year full cash value or fair market value of the Reserve, pursuant to the mandate of section 110(b). However, the trial court concluded, and Occidental argues on appeal, that Occidental overcame this presumption by evidence of "proved reserves" under rule 468.
After review of the administrative record, we conclude Occidental failed to present substantial evidence that the proper application of rule 468, including its definition of "proved reserves," produces here an assessed valuation contrary to the presumed valuation.
Both parties to the AAB hearing presented voluminous documentary evidence and extensive live testimony. All of Occidental's evidence, however, was focused on providing a basis for the valuation testimony of its expert witness, Forrest Garb. And although Garb claimed he was using the rule 468 proved-reserve standard for valuation of the petroleum rights, the substance of his testimony and his written report unequivocally contradicts that claim.[10] When an expert's opinion is premised upon facts contradicted by the only evidence of record, the expert's opinion does not constitute substantial evidence in support of the judgment. (Estate of Powers (1947) 81 Cal.App.2d 480, 485-486, 184 P.2d 319; see White v. State of California (1971) 21 Cal.App.3d 738, 759-760, 99 Cal.Rptr. 58.)
*605 We first consider Garb's testimony. As concerns the present subject, Garb began by setting up an apparent identity between the rule 468 definition of "proved reserves" and the petroleum industry's definition. The testimony unfolded in the following manner. Garb read into the record the July 1979 rule definition of "proved reserves"including the portion stating that proved reserves include those reasonably certain of production under "projected economic conditions." Then Garb defined "reserves" in accordance with petroleum industry standards: "The definition for a reserve commonly used in the industry is that amount of hydrocarbon which can be economically recovered under present or forecast economic conditions under existing government regulations." This established a parallel between rule 468's "proved reserves" and the industry's "reserves," in that both include "projected economic conditions" when determining the amount of a particular reserve.
Next, without noting that he was addressing only the latter category (industry "reserves"), Garb then proceeded to divide "reserves" into "proved" and "unproved." He emphasized that the subcategory of "proved reserves" was concerned exclusively with production under current, not projected, economic and technical factors. From that point, Garb's testimony proceeded as if he had demonstrated that "proved reserves" in rule 468 shared this focus on current conditions.
Later, on cross-examination, Garb testified: "It is my understanding that the tax base under [rule] 468 is only to be the proved reserves. As additional reserves become proved, they will be added." Immediately thereafter, county counsel referred Garb to the Society of Petroleum Engineers' definition of proved reserves that we have set forth above, which limits proved reserves to those reasonably certain of production "under current economic conditions, operating methods, and governmental regulations." Garb testified that this latter definition of proved reserves is the measurement of value of petroleum reserves for California property tax purposes.[11]
Garb's written report acknowledges, but attempts to minimize, the difference in proved-reserve definitions: "Although the reserve definitions from the accepted sources are similar, there are some slight differences .... The SBE Rule 468 definitions allow reasonably projected economic and operating conditions to be assumed. In this regard, this definition is different from [industry] definitions." (Italics added.)
In fact, the difference between the two definitions is huge. Garb writes that "a willing buyer and a willing seller may assign risked values to the various categories of reserves." (Italics added.) However, he notes that "in the final analysis, no amount of risk adjustment can change the actual category" of reserves under industry definitions. It is precisely the fact that knowledgeable buyers and sellers assign risk-adjusted values to reserves classified by the industry as "unproved" that requires those risk-adjusted values to be included in rule 468 "proved reserves" under the express language of rule 468(b) and (c)(1).[12]
*606 Garb testified that various oil field operators might use different information in placing a fair market value on petroleum extraction rights. (See also SBE, Assessment of Petroleum Properties, op. cit. supra, p. 8-10.) Nevertheless, he readily acknowledged that the evaluation of reserves defined by the industry as "unproved" was a common (and indeed necessary) component of an appraisal of petroleum properties. While the manner in which various appraisers reasonably discount the value of these "unproved" reserves might well vary, industry standards for determination of valueexpressly incorporated into the rule 468 methodologywould preclude assigning no value at all to the reserves.
When we turn to the internal study of the Reserve property by Occidental itself, it is clear that Occidental's appraisers considered the value of "unproved" reserves. Based on the stipulated confidentiality of the relevant materials, it would be inappropriate to provide details of Occidental's methodology for arriving at its bid price for the Reserve; it will suffice to say that various unproved reserves were discounted (or "risked") at totals from 3 to 25 percent of the "unrisked" potential for the various oil fields. Garb testified that Occidental "obviously thought to them eventually [the Reserve] would be worth what they paid for it.... They had a value established for the proved reserves. They paid twice that to obtain the expectation of developing the unproved reserve." Occidental's counsel acknowledged in his opening statement to AAB that the evidence would show only the value of industry-defined "proved reserves," which Occidental claimed were the only reserves rule 468 attempted to measure: "[U]nproved reserves are not taxable, are not assessable. Did we buy them? We did. What did we buy? We bought expectancies. We bought something that's not taxable.... It had no value under Rule 468."
In summary, it is only by treating proved reserves according to industry definitionsthose reserves presently recoverable on a profitable basisthat Occidental's expert was able to conclude that the value of the Reserve property's mineral rights was only $1,921 billion. By contrast, Rule 468 requires an "estimate of what 100 percent of the property would sell for in the open market on the lien date, meeting every condition of an arms length transaction. All of the risks associated with the property and a satisfactory return to the purchaser should be reflected in the current market value." (SBE, Assessment of Petroleum Properties, op. cit. supra, p. 8-12.) Accordingly, we conclude Occidental did not overcome the presumption that the value of the Reserve mineral interest was accurately reflected by the allocated purchase price.

V. Conclusion
The trial court impliedly found that "proved reserves" had the meaning attributed to it by Occidental and expressly found that this standard, incorporated into rule 468, provided a statutory or administrative exception to the general requirement of article XIII, section 1 of the *607 Constitution, that all property be taxed according to its fair market value. The trial court's statement of decision states: "In other words, the Constitution allows certain property to be valued on a basis other than fair market value, presumably where the realities of ownership and public policy require otherwise as determined by statute or regulation.... [¶] ... Rule 468 creates a value standard for oil and gas properties differen[t] from other kinds of ownership interests."
This perception that rule 468 reflects an administrative determination to exclude from valuation "unproved reserves" as defined by the Society of Petroleum Engineers led the trial court to reject Assessor's assertion that such "unproved reserves" must be counted in some manner in order to ascertain the full value of the Reserve. The statement of decision discusses the matter in the following terms: "The assessor contends ... taxpayer's appraiser ... wrongly calculated `prove[d] reserves' as defined in Rule 468(b) and that he should have included `risk adjusted' amounts of `unproven reserves' in that calculation.... [¶] The court can find no support for this interpretation of Rule 468. The assessor's argument[ ] seems to stem from the logic that [Occidental] would not have agreed to pay that much for property if they weren't convinced there was a huge amount (almost $1.7 billion) of unproven reserves in the ground. This may be true. That, however, is not how Rule 468 defines taxable value for mineral rights. Only proven reserves as valued by the income stream appraisal are taxable and the definition is not expandable to make the risk taken by the taxpayer that they guessed right as to unproved reserves taxable as well."
As we have discussed at some length above, we conclude that rule 468 does not attempt to create an exception to the fair market value basis of taxation generally established in article XIII, section 1. Rather, as noted, the rule crystallizes the fair market value standard in the particular context of the right to extract petroleum from the ground.
Accordingly, while we agree with the trial court that the rule does not seek to tax "the risk taken by the taxpayer that they guessed right," rule 468 does base taxable value on all reserves "which geological and engineering information indicate with reasonable certainty to be recoverable in the future, taking into account reasonably projected physical and economic operating conditions." (Rule 468(b).) That value "shall be determined using factual market data such as prices and expenses ordinarily considered by knowledgeable and informed persons engaged in the operation, buying and selling of oil, gas and other mineral-producing properties and the production therefrom." (Rule 468(c)(1).) Similarly, "[p]resent and projected economic conditions"that is, the conditions that allow unproved reserves to become proved reserves under industry definitions"shall be determined by reference to all economic factors considered by knowledgeable and informed persons engaged in the operation and buying or selling of such properties, e.g., capitalization rates, product prices and operation expenses." (Rule 468(b).)
Finally, we note that Assessor has presented no sufficient argument in support of the idea that Occidental should be taxed upon a property value of $3.65 billion, when the adjusted purchase price of the Reserve was $3.53 billion. Accordingly, the writ of mandate shall direct AAB to establish the value of the Reserve at $3.53 billion.

DISPOSITION
The judgment is reversed. The trial court is directed to grant Assessor's petition *608 for writ of mandate and to direct respondent to establish the value of the property in question at $3.53 billion. Assessor is awarded his costs on appeal. Occidental's cross-appeal is dismissed as moot.
WE CONCUR: HARRIS and WISEMAN, JJ.
NOTES
[1] Revenue and Taxation Code section 110 provides, in part:

"(a) Except as is otherwise provided in Section 110.1, `full cash value' or `fair market value' means the amount of cash or its equivalent that property would bring if exposed for sale in the open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and both the buyer and the seller have knowledge of all of the uses and purposes to which the property is adapted and for which it is capable of being used, and of the enforceable restrictions upon those uses and purposes. "(b) For purposes of determining the `full cash value' or `fair market value' of real property, other than possessory interests, being appraised upon a purchase, `full cash value' or `fair market value' is the purchase price paid in the transaction unless it is established by a preponderance of the evidence that the real property would not have transferred for that purchase price in an open market transaction. The purchase price shall, however, be rebuttably presumed to be the `full cash value' or `fair market value' if the terms of the transaction were negotiated at arms length between a knowledgeable transferor and transferee neither of which could take advantage of the exigencies of the other...."
[2] Occidental's notice of appeal also stated it cross-appeals from the trial court's "decision regarding `The Presumption under Rev. and Tax.Code, Section 110(b)' set forth on the second through fifth pages of the Court's April 19, 2001 Statement of Decision."
[3] In its brief, Occidental contends value established pursuant to rule 468 rebuts the presumption of section 110(b) "as a matter of law" because the rule "draws its authority directly from the California Constitution...." It is not immediately apparent to us that SBE has the authority by rulemaking to exempt oil and gas producers from the statutory requirement that purchase price is the fair market value "unless it is established by a preponderance of the evidence that the real property would not have transferred for that purchase price in an open market transaction," as provided by section 110(b). (See Hahn v. State Bd. of Equalization (1999) 73 Cal.App.4th 985, 996-997, 87 Cal.Rptr.2d 282.) Nor is it apparent SBE attempted to do so by means of rule 468. However, we have no occasion to resolve either contention in the present case because we conclude Occidental did not present substantial evidence of the value of the Reserve under rule 468, as we explain below.
[4] Amici Western States Petroleum Association, California Independent Petroleum Association, and Independent Oil Producers' Agency (collectively amici curiae) assert in their joint brief that Assessor is seeking to tax "reserves that have not yet been proven to exist." (Italics omitted.) Not so. Reserves are not taxed at all. Rather, proved reserves, as defined by law, are a tool of measurement by which the right to remove all oil and gas from the land is valued; that valuation forms the basis for taxation of the right to use the land in a particular way.
[5] We grant the requests for judicial notice filed by Assessor on June 21, 2002, Occidental on March 01, 2002, and by amici curiae on March 5, 2002.
[6] Minor, nonsubstantive amendments were adopted by SBE in 2001. These are not relevant to the present case.
[7] One traditional statement of fair market value contained in the Revenue and Taxation Code is what we quoted above from section 110(b): fair market value is the price that would be obtained where "the terms of the transaction were negotiated at arms length between a knowledgeable transferor and transferee neither of which could take advantage of the exigencies of the other."
[8] The current SEC rule, 17 Code of Federal Regulations section § 210.4-10(a)(2), provides in part: "Proved oil and gas reserves. Proved oil and gas reserves are the estimated quantities of crude oil, natural gas, and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in future years from known reservoirs under existing economic and operating conditions, i.e., prices and costs as of the date the estimate is made. Prices include consideration of changes in existing prices provided only by contractual arrangements, but not on escalations based upon future conditions."
[9] James Delaney, retired general counsel of SBE, appearing as a witness on behalf of Occidental, testified to the effect that he, in drafting rule 468, attempted to "pick up accepted definitions of proved and unproved reserves," namely, the definitions established within the petroleum industry. This testimony is unpersuasive. "The motive or purpose of the drafters of a statute is not relevant to its construction, absent reason to conclude that the body which adopted the statute was aware of that purpose and believed the language of the proposal would accomplish it." (Taxpayers to Limit Campaign Spending v. Fair Pol. Practices Com. (1990) 51 Cal.3d 744, 764-765, fn. 10, 274 Cal.Rptr. 787, 799 P.2d 1220.) In the present case, the administrative record contemporaneous to the adoption and amendment of rule 468 clearly reflects a contrary "administrative intent" in adopting the rule than the intent attributed to SBE in Delaney's after-the-fact statements. The SBE's official handbook section entitled Assessment of Petroleum Properties states: "The significant difference between the Rule definition of proved reserves and the SPE or SPEE definition is that Rule 468(b) allows inclusion of reserves derived from future expectations for product prices and operating costs." (State Bd. Equalization, Assessors' Handbook, Section 566, Assessment of Petroleum Properties (1999 rev.) p. 4-2 (hereafter SBE, Assessment of Petroleum Properties).)
[10] Although Garb acknowledged there is a difference between the definition of proved reserves under rule 468 and the industry's definitions, Occidental appears to ignore the distinction on this appeal. Occidental's argument is well summarized in this paragraph from its respondent's brief: "The oil and gas industry, the California State Board of Equalization and the Securities and Exchange Commission characterize amounts of oil in place (still in the ground) according to the likelihood that they will actually be produced. Most oil in place can never be brought to the surface. `Proved reserves' is that fraction of the oil for which there is a `reasonable certainty of recovery.' The remaining portion of the oil and gas is graded as `unproved,' which category is also sub-divided into various increments according to the likelihood that the oil will ultimately be recovered. Only the right to produce the proved reserve increment of the oil in place, as that quantity changes from time to time as dictated by production, economics and technology, is deemed sufficiently certain to be assessed under California's property tax law. Unproven reserves, including so-called `probable' and `possible' reserves, have an opportunity or `upside' value in the market, but such value is deemed too speculative to support property tax assessment." We note in passing that rule 468 nowhere uses the terms "unproved reserves," "probable reserves," or "possible reserves." It uses only "proved reserves," which it specifically defines in the manner discussed in the preceding part.
[11] Although Garb purported to find the fair market value using other permissible approaches, he again employed the erroneous premise that rule 468 valued proved reserves only as defined within the petroleum industry. Those alternative methodologies do not constitute substantial evidence of fair market value because, like Garb's primary methodology, they appraise only industry-defined proved reserves.
[12] As stated in a report commissioned by DOE to establish the minimum value of the Reserve: "An approach commonly adopted for valuation concerns the applicability of simple risk factors applied to the unrisked economics model output. In the case [sic] a risk factor varying from zero to one would be applied to the output results consolidated by reserve category to yield a risked valuation." (Rep. Of Richard J. Miller & Associates, Inc. dated June 30, 2000.) The authors adopted factors ranging from .96 for proved developed producing reserves to .22 for probable reserves. Other appraisers reported using factors from 1.00 for proved developed producing reserves to .65 for probable reserves to .25 for possible reserves, with all reserves classified according to industry definitions.